COLUMBUS HOTEL CORP., *et al.,* v. HOTEL MANAGEMENT Co., *et al.*

156 So. 893.
Division A.
Opinion Filed September 11, 1934.
Rehearing Denied October 26, 1934.

466

*Evans, Mershon & Sawyer, Herman T. Stichmen* (New

York City), *L. L. Robinson* and *M. L. Mershon*, for Appellants;

*John P. Stokes, R. D. Knight, J. C. Cooper, Jr., C. G. Ashley* and *Loftin, Stokes & Calkins*, for Appellees.

DAVIS, C. J.—The subject of this suit was the Columbus Hotel properties located at Miami, Florida. Its object was to retrieve, by equitable proceedings, certain advantages for the benefit of holders of bonds on same that had been sold through G. L. Miller & Company, Inc., a bankrupt corporation. The advantages in controversy were alleged by complainants, suing as protective committee, to have been fraudulently obtained from them by means of covin, fraud and misrepresentation on the part of one S. A. Lynch, in his dealings with the parties in interest. Complainants lost in the court below. They have brought their cause here on appeal from the final decree dismissing their suit on its merits at the final hearing had on complainant's bill of complaint, answer and testimony.

The dismissed bill of complaint was in the nature of a bill of review, to set aside an executed foreclosure decree of the Circuit Court, but the principal relief sought was the rescission and cancellation of a certain agreement in writing, dated February 15, 1928, that had been entered into and executed between George E. Roosevelt and associates, constituting the bondholder's committee, and Hotel Management Company, the principal party appellee to this appeal.

Embraced in the prayer for relief, was a demand for the rescission, cancellation and setting aside of the various steps and acts of the several parties, taken or done by them toward, or in the course of their performance of, the February 15, 1928, agreement. Chief among such steps taken had been the entry of a consent foreclosure decree by the Circuit Court of Dade County, under which the properties fore-

closed against had been sold and purchased in accordance with the February 15, 1928, agreement of settlement and compromise. This consent decree was sought to be set aside. Prayed also was the cancellation of all rights that had been acquired under it by Hotel Management Company, S. A. Lynch, and others, including the right to occupy the Columbus Hotel and operate it under a certain lease that had been derived from Columbus Hotel Corporation. Finally it was prayed that the several parties to the proceeding be each restored to their former positions and rights, as they existed prior to the making of the particular agreement sought to be rescinded and cancelled.

The original and amended bill of complaint discloses that one of the defendants, Miami Holding Company, a corporation, owned as lessee and held the record title to certain ninety-nine-year leases which were later utilized as a site for the erection of the Columbus Hotel; that embraced in these leases was an option to purchase the leased site for $208,000.00; that on or about January 31, 1925, said Miami Holding Company, desiring to erect a hotel upon a portion of the leased property, through S. A. Lynch and T. W. Palmer, entered into an underwriting agreement with G. L. Miller & Company, Inc., a Florida corporation, for the issue and sale of $1,600,000.00 in principal amount of bonds, to be secured by a first mortgage upon a leasehold interest in the hotel site; that to carry out the enterprise of financing thus undertaken, that it was agreed that Miami Holding Company should execute a ninety-three-year sub-lease on the property to East Coast Enterprises, Inc., another corporation, the stock of which Miami Holding Company owned and controlled; the sub-lease was to carry an annual rental starting at $60,000.00, which rental, however, should increase every five years at the rate of $5,000.00 until a maximum rental of $100,000.00 per annum should

be reached; that the bonds to be issued to finance the erec-. tion of the hotel were to be issued through East Coast Enterprises, Inc., and should, by a written guaranty endorsed thereon, be guaranteed by the Miami Holding Company and secured by a first mortgage trust deed, with G. L. Miller, as trustee, upon the ninety-three-year lease hold sub-interest of East Coast Enterprises, Inc.; that another corporation, S. A. Lynch Enterprises Finance Corporation, should guarantee the placing in the completed hotel of $300,000.00 in furnishings, fully paid for; that 3,148 bonds aggregating the principal sum of $1,600,000.00 were accordingly issued by East Coast Enterprises, Inc., in pursuance of said underwriting agreement, each of which bonds contained endorsed thereon the written guaranty of Miami Holding Company;. other steps contemplated by the financing arrangements, not necessary to here particularize, were carried out, with the result that all of the contemplated bonds were duly authenticated, sold, issued and delivered by East Coast Enterprises, Inc., or its representatives, and the hotel building was completed about March 15, 1926.

Shortly after the erection of the hotel had been accomplished, East Coast Enterprises, Inc., made a five-year lease of the completed hotel to Hotel Operating Company of America, the annual rental being agreed upon to start at: $325,000.00 a year and increase to $450,000.00 a year should the lease be renewed and continue for the extended period of ten years after the expiration of the period originally specified. Not long thereafter, the hotel was damaged by the hurricane of September, 1926, for which damage, in-. surance in the sum of $175,000.00 was realized.

On or about September 27, 1926, G. L. Miller & Company, Inc., which had underwritten the $1,600,000.00 bond issue, issued by East Coast Enterprises, Inc., became an involuntary bankrupt in the United States District Court for the.

Southern District of New York. This event led to the setting up of a bondholders' protective committee for the general purpose of protecting the interests of holders of bonds, and of interim receipts calling therefor, sold by or through G. L. Miller & Company, Inc., including the bonds issued by East Coast Enterprises, Inc., the approval of Honorable Julian W. Mack, United States Circuit Judge, before whom the bankruptcy proceedings were pending, being a condition of the protective arrangement.

East Coast Enterprises, Inc., defaulted on its bonds and foreclosure proceedings based thereon were begun in the Circuit Court of Dade County on January 7, 1927, by complainants purporting to act as trustees under the trust deed securing the bonds. Defendants named in the suit were East Coast Enterprises, Inc., Miami Holding Company, and others. On June 3, 1927, Biscayne Trust Company, as alleged successor trustee to G. L. Miller, filed an amended bill in that suit, very much broadening the scope of the relief prayed and making as defendants thereto all of the associated and interrelated corporate entities that were alleged to have, or were supposed to have, some right, title, interest or liability in connection with the indebtedness which the foreclosure suit was instituted to enforce in the first instance. Among the claims involved were those for alleged dissipation of the insurance moneys that had been collected the year before; claims and alleged liens upon the hotel property, its furnishings and fixtures; claims of the unpaid contractor, Realty Construction Company, and assertions of liability based upon the guaranties and other undertakings had in connection with the enterprise of financing and building the completed hotel. In this suit a receiver was appointed and under that appointment the possession of real and personal property involved passed into the receiver's custody.

Such being the status of things, it is alleged that in the late summer of 1927, S. A. Lynch entered into certain negotiations with the Bondholders' Committee looking to the working out of some settlement by which Lynch, through some one of his corporations, might acquire and take over the possession of the hotel, its furniture and fixtures, and thereby settle the pending litigation in which the bondholders were engaged, through the activities of their trustee, in attempting to collect the indebtedness represented by the outstanding defaulted bonds. The negotiations thus begun, culminated in the execution of the contract of February 15, 1928, the rescission of which became the principal object of this suit, when the Bondholders' Committee claimed to have discovered fraudulent representations on the part of Lynch in connection with its inducement.

So, as disclosed by the bill of complaint, the gravamen of the equity asserted by the Bondholders' Committee as against the defendants below was that Lynch falsely and fraudulently had represented that Miami Holding Company, the guarantor upon the bonds issued by East Coast Enterprises, Inc., had no assets, and was utterly insolvent and defunct, whereas in truth and in fact it was in contemplation of law the owner of property and assets consisting of leaseholds, lands, mortgages, notes, accounts, contracts and stocks of great value that had been by it fraudulently conveyed to a corporation described as Enterprise Realty & Securities Corporation, one of the defendants, through one C. E. Holcomb, who was a brother-in-law of Lynch, and that such assignment from said Miami Holding Company to the said C. E. Holcomb, was at most, a mortgage to secure the repayment to said S. A. Lynch of certain moneys owing to him, and not an absolute and *bona fide* conveyance, as on its face it appeared to be; (2) that a certain retention of title contract appearing as enforceable against the furnishings in

the hotel unless the sum of $51,000.00 should be paid to one John A. Cunningham, the holder thereof, was in truth and in fact not an enforceable retention of title contract at all, because made long after the furniture had been sold on open account, and that the amount due on same, if good, was only $12,000.00 or thereabouts and not $51,000.00 as appeared.

And so, claiming to have been deceived into believing the statements and representations of S. A. Lynch to be true in the particulars just referred to, and relying upon the same, and being induced by the picture which the alleged deception presented to them as being greatly to their disadvantage if any other course were taken, the Bondholders' Committee assert that they entered into the written agreement of February 15, 1928, and that the approval of the Honorable Julian W. Mack, United States Circuit Judge, was procured thereto solely in reliance upon and belief in such alleged representations as being true.

The agreement of February 15, 1928 (which had been carried out in its essential parts at the time the suit below was brought) provided, in short, that there should be a new corporation created for the purpose of receiving from the bondholders' committee a transfer of all deposited bonds, in exchange for seventy-five per cent. of the new corporation's stock; that Lynch's corporation, Hotel Management Company, should acquire and assign to the new corporation (which was created and became the appellant, Columbus Hotel Corporation) all of the alleged outstanding mechanic's and materialmen's liens, and retention of title claims, against the mortgaged hotel, its furnishings and fixtures, elevators or equipment, in return for which Hotel Management Compnay would receive twenty-five per cent. of the stock in the new corporation to be created.

So the result of the carrying out of the February 15, 1928, agreement is alleged to be: that the hotel properties

passed to Columbus Hotel Corporation, in which corporation the bondholders received seventy-five per cent. of the stock in exchange for their bonds; the Hotel Management Company, and S. A. Lynch corporation, became the owner of twenty-five per cent. of the stock of Columbus Hotel Corporation; the Hotel Management Company obtained a lease on the hotel as an operating proposition running until May 1, 1938, by which lease said Hotel Management Company acquired certain valuable rights, in addition to the lease privilege, from Columbus Hotel Corporation; that S. A. Lynch, through his corporation, Hotel Management Company, enjoys the right to have the first opportunity to buy the real and personal property constituting the Columbus Hotel and furnishings at any price for which Columbus Hotel Corporation, the Bondholders' Committee and the stockholders and officers of Columbus Corporation decide to sell, and in the event thereof, will, by reason of the twenty-five per cent. stock interest of Hotel Management Company in Columbus Hotel Corporation, receive one-fourth of the next amount realized from the sale of said hotel property and furnishings by Columbus Hotel Corporation, should the same be sold. All of these advantages, it is claimed, are in reality advantages that will be enjoyed by S. A. Lynch, as the true owner, and dominating factor, in the several corporations constituting a part of the development of the original enterprise, and all of them, so it is charged, are so now held and enjoyed as the direct result of the fraudulent representations and manipulations of the said S. A. Lynch in the course of his deception alleged to have been practiced upon the bondholders' committee and United States Judge Mack, who approved the agreement of February 15, 1928, by which such advantages and benefits were secured and are held.

The defendants, Hotel Management Company, Enter-

prise Realty & Securities Corporation, Enterprise Building Corporation, S. A. Lynch Enterprise Finance Corporation and S. A. Lynch, and his associates in business, upon whom the burden of the charges made by the bill of complaint was laid, answered at length denying the fraud, misrepresentation and collusion charged; averred that the defendant S. A. Lynch had entered into no negotiations with the Bondholders' Committee as alleged, but that the agreement of February 15, 1928, was negotiated by the Hotel Management Company, an independent corporation, subject to the approval of the Honorable Julian W. Mack, United States Circuit Judge having jurisdiction over the Bondholders' Committee; that same was entered into fairly and without any representations of any kind having been made by the defendant S. A. Lynch, or by anyone for him as an inducement for the consummation of the same; that on the contrary, that throughout all negotiations that had been had leading up to the agreement of February 15, 1928, sought to be rescinded on the ground of alleged misrepresentation and fraud on the part of S. A. Lynch and his associates, it had been expressly understood and agreed between the said S. A. Lynch, and his associates, on the one hand, and by the Bondholders' Committee, on the other hand, that no statements made by the several parties in the course of their negotiations should be relied upon, and that no reliance was to be placed upon any statement made at any time with respect to the status, rights or liabilities of any person, natural or corporate, connected with, or at any time interested in, the Columbus Hotel properties; that neither the said Bondholders' Committee, nor any representative of it, had ever relied upon any statement purporting to have been made by or on behalf of the defendant, S. A. Lynch, but on the contrary at all times had knowledge sufficient to put them upon notice of all the matters and things complained of in the

suit as ground for rescission of the February 15, 1928, agreement; that had they desired to raise any of the propositions or questions now presented as a cause for complaint against the fairness of the settlement concluded by means of the executed contract, they could have done so long prior to the present suit; that the said bondholders' committee had made its own independent investigation of the financial condition of the Miami Holdings Company which is alleged to have been fraudulently misrepresented by S. A. Lynch as being insolvent; that as a consequence, the committee had relied and acted upon the results of its own independent investigation and had not acted upon any statement either made, or purporting to have been made, by or on behalf of S. A. Lynch; that all transactions had, or participated in, by said defendants, S. A. Lynch or by his alleged corporations, were fairly and honestly entered into and carried out, including the negotiations which led to the execution of the agreement of February 15, 1928; that during all the time mentioned, the Committee complainant was undertaking to handle controversies and litigation in behalf of the bondholders, during the course of which they had been adequately represented by counsel both in the City of Miami, Florida, and in the City of New York; that both the Bondholders' Committee and its counsel had had ample time to investigate, and did investigate the bondholders' rights in connection with the matters now attempted to be brought again in litigation; that although three years and more had elapsed since the consummation of the February 15, 1928, agreement, that no complaint against its effectiveness had heretofore been judicially asserted; that by reason of the execution of the said February 15, 1928, contract, and the changes in the status of things wrought thereby, that it would be utterly impossible for the parties to be placed in *status quo,* should the relief be granted.

Demurrers were incorporated in the answer challenging the equity of the bill. Subsequently motions to dismiss the bill of complaint, after certain amendments had been made thereto, were filed before final hearing. Both the demurrers and motions to dismiss were specifically overruled in the final decree. The Chancellor thereupon found that the equities were with the defendants and dismissed the bill on that finding.

A careful study and analysis of the original, and of the amended bill of complaint, has convinced us that the allegations therein set forth were sufficient to withstand a general demurrer or motion to dismiss for want of equity. We have also concluded that complainants' statement of their cause of action in their pleadings was sufficient to make out a case for equitable relief involving the particular remedy of rescission, within the purview of the rules of law governing that subject. So the court committed no error in overruling defendants' demurrers and motions to dismiss before deciding the cause on its merits.

Equity will grant to a complaining party rescission of an agreement procured through fraud, deceit, artifice or trickery practiced upon him by the opposite party, even after it had been partially executed, in cases where it is made to appear that the complaining party would not have entered into such agreement, nor changed his position thereby, if it had not been for the influence of such fraud, deceit, artifice or trickery so practiced upon him. See authorities hereinafter cited.

And, by a bill in equity in the nature of a bill of review, equity will for the same causes, vacate a judgment or consent decree that has been entered in pursuance of such an agreement, since fraud, deceit, artifice or trickery employed in procuring a complaining party's consent to a voluntary judgment or decree entered pursuant to a fraudulently pro-

cured agreement, is regarded as extrinsic fraud, against which equity has jurisdiction to relieve by acting directly upon the consciences of the parties to the agreement which has resulted in such judgment or decree. Smith v. Richards, 13 Peters (US) 26, 10 L. Ed. 42; Nixon v. Temple Terrace Estates, 97 Fla. 392; 121 Sou. Rep. 475; Willis v. Fowler, 102 Fla. 35, 136 Sou. Rep. 358; Peeple v. Rogers, 104 Fla. 462, 140 So. Rep. 205; United States v. Throckmorton, 98 U. S. 61, 25 L. Ed. 93; Pico v. Cohn, 91 Cal. 129, 25 Pac. 970, 13 L. R. A. 336; Miami Bank & Trust Company v. Mahlstedt, 107 Fla. 282, 144 Sou. Rep. 659; Powers v. Scales, 61 Fla. 717, 55 Sou. Rep. 799; 15 Ruling Case Law 762; Freeman on Judgments (5th Ed.) Sec. 1231; 21 Corpus Juris, 769.

But it is also a general rule (with some exceptions, of course) that a contract cannot be rescinded, even for fraud or misrepresentation, where it is not possible for the parties to be put back into their original positions, or restored to their original rights, a fraudulently induced contract not being illegal *per se.*

And it is uniformly required that, where a party desires to rescind a contract, or to have a consent judgment or decree vacated, on the ground of mistake, fraud, misrepresentation, deceit or trickery practiced in its procurement, the injured party must, upon discovery of the true facts, promptly announce his purpose to rescind, adhere to it, and be guilty of no undue delay nor vacillation in moving speedily to have his rights formally asserted by way of rescission as a remedy.

One who seeks rescission of a contract is not permitted to play fast and loose. Nor may he remain silent and continue to treat the benefits of the contract as his own without losing his right to rescind and thereby becoming conclusively bound by the contract, judgment or decree involved, as if

no mistake, fraud or misrepresentation had occurred in its procurement or inducement. Vacillation, like delay, may likewise be fatal to a right of rescission that would otherwise exist. Lake Mabel Development Corporation v. Bird, 99 Fla. 253, 126 Sou. Rep. 356; Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798; Pryor v. Oak Ridge Development Corporation, 97 Fla. 1085, 119 Sou. Rep. 326; Smith v. Baffin, 115 Fla. 418, 155 Sou. Rep. 658; Prudential Insurance Company of America v. Prescott, decided on rehearing at the present term (Opinion filed June 26, 1934); A. L. I. Restatement Law of Contracts, Pars. 470-491.

Appellants contend that their bill, being in the nature of a bill of review seeking rescission of the agreement of February 15, 1928, and of all steps taken in its performance, because of the alleged false representations, fraudulent conduct and fraudulent concealment on the part of the defendants in the inducement thereof, having been held good as against demurrer, was sustained at the final hearing by the preponderance and probative effect of the evidence adduced in its support, and that in the absence of some legally sufficient affirmative defense, which they assert was never duly proven by the evidence, the complainants' amended bill entitled them to the relief prayed and should not have been dismissed on its merits, and that the Chancellor therefore erred in entering the final decree from which this appeal was taken. With this phase of appellant's argument we shall now deal.

It appears from the evidence that sometime in 1926, a suit was begun in the United States District Court for the Southern District of Florida, by a man named Trout and others against East Coast Enterprises, Inc., and divers defendants, the object of such suit being the enforcement of certain of the bonds of the $1,600,000.00 bond issue that had

been floated by East Coast Enterprises, Inc., through the G. L. Miller & Company, Inc. That suit was dismissed.

Afterward there was filed in the Circuit Court of Dade County another suit brought in the name of Hillard Spalding, as substituted trustee for G. L. Miller, resigned, and G. L. Miller, the object of this suit being the foreclosure of the trust deed that had been executed to secure the principal bond issue. Following the bringing of the last suit, the Biscayne Trust Company was selected as trustee under the $1,600,000.00 mortgage then in process of foreclosure, so that the foreclosure proceeded thereafter in its name as complainant, but for the benefit of the bondholders, who in due course became and were represented by the bondholders' committee, the complainants in the present case.

The bondholders' deposit agreement was dated December 22, 1926. That agreement was the authority for the formation of the Bondholders' Commitee, which in February, 1927, after the Circuit Court foreclosure bill had been filed in January, 1927, caused to be sent to Florida a Mr. Thatcher, an able New York attorney, for the purpose of investigating the general situation insofar as it pertained to the rights and interests of the bondholders.

It was shown by the evidence that on this visit, Mr. Thatcher stated that he was investigating the circumstances surrounding the issuance of the defaulted bonds and the assignment of a sub-lease bearing thereon, and that unless some satisfactory plan were worked out for the benefit of the bondholders in the premises, that he proposed to bring whatever lawsuits could be brought with respect to the subject, against any and all parties who might have incurred liabilities as to the bonds. Subsequent to this, various conferences were held with interested parties in an endeavor to work out some satisfactory plan by which the pending litigation might be ended, and the bonded properties put

to some beneficial use to the advantage of the bondholders. These negotiations were started and were carried on in an atmosphere wherein Mr. Thatcher, as counsel for the bondholders' committee was asserting from time to time that the Committee had various causes of action, among others for fraud, against S. A. Lynch and divers companies which the bondholders' committee contended had been dominated, and were beneficially owned by him.

The negotiations for settlement thus begun, led to the preparation of an agreement, dated August 24, 1927, by which S. A. Lynch, Enterprise Finance Corporation, tentatively agreed with the Bondholders' Committee that the former should purchase all deposited bonds at 30 cents on the dollar in cash, and pay for the benefit of the bondholders the compensation of the Bondholders' Committee and its counsel, amounting to $46,250.00. This agreement was subject, however, to the approval of Federal Judge Mack, under whose jurisdiction the matter was being handled and without whose approval, the bondholders' committee had no power to act.

At a hearing held in New York, Judge Mack declined to approve the proposed agreement of August 24, 1927, and announced in no uncertain terms, that proceedings would be directed to be set in motion against any and all persons or corporations who might be found to be liable on obligations to the bondholders, particularly S. A. Lynch and his associates. The announcement of Judge Mack was met with a response from Lynch's counsel that "I know of no reason why our client should not be delighted to respond to any bar to which he might be called, with full knowledge of his entire innocence of any and every civil liability or otherwise." Further negotiations were thereupon temporarily broken off.

It thus appears from the evidence that there was through-

out, a period of pending and threatened litigation suggesting liability on the part of Lynch and his alleged corporations, personal and otherwise, with respect to the claims being pressed by the Bondholders' Committee. It also appears that the Bondholders' Committee were desirous, if not anxious, to realize a settlement of the pending foreclosure and other claims favorable to themselves. And so it was that the Bondholders' Committee and its counsel on one hand, and the S. A. Lynch enterprises and their counsel on the other hand, were in continued hostile relations toward each other, during the entire negotiations for a settlement, and were each so acting with respect to the subject of the negotiations looking toward a settlement of their adverse claims, that neither was placing very much, if any, reliance upon statements or representations made by the other, except as might be confirmed by the result of an investigation made on their own independent resources and dictated by their own independent judgments.

The representatives of the bondholders had many times threatened to have set aside as fraudulent, the assignment to Holcomb, and had repeatedly charged S. A. Lynch with having "gutted" Miami Holding Company, the guarantor of the bonds. And from time to time the negotiations for settlement were temporarily suspended accompanied by renewed threats of litigation against Lynch and his alleged corporations unless a favorable settlement were made, satisfactory to the bondholders and Judge Mack. On more than one occasion the Bondholders' Committee was expressly invited by Lynch's counsel to go ahead and bring whatever suits they might have to bring. And when requests were made upon Lynch and his associates to furnish specific statements concerning the Miami Holding Company, several refusals were communicated to the demand of the bondholders.

It is argued on behalf of the appellants that the sole and only inducement for their entering into the agreement of February 15, 1928, was their belief (a) that the Miami Holding Company, the guarantor upon the Columbus Hotel bonds, had no assets and was utterly insolvent and defunct; (b) that a recorded transfer which had been made by Miami Holding Company, the guarantor on the bonds, to C. E. Holcomb, Lynch's brother-in-law, on March 21, 1925, of the sub-lease with East Coast Enterprises, Inc., with the right to receive the rental thereunder, together with other rights of Miami Holding Company, in the leased property, was an absolute, unconditional outright assignment for a valuable consideration, and not an assignment made by way of security for an existing debt, or fraudulently made to defeat creditors of Miami Holding Company; (c) that the retention of title contract between East Coast Enterprises, Inc., and John A. Cunningham, upon the furniture in the hotel the bondholders were foreclosing their trust deed upon, was a valid retain title contract as it appeared to be, that is to say, an enforceable retain title claim for $51,000.00, under which Cunningham, if not paid, could remove the beds and other furniture from the Columbus Hotel, thereby rendering it unfitted for hotel uses without the purchase of new furniture.

Appellants further insist that such belief on their part was induced by affirmative misrepresentations made to them by S. A. Lynch and those acting in his interest, or at least, that representations were made under circumstances that amounted to false representations to the foregoing effect.

Opposed to this, the appellees contend that throughout the entire period of the long course of controversial negotiations for settlement had between Hotel Management Company and representatives of the bondholders, that both sides had been fully represented by able counsel, that each

was specifically advised that whatever was said or done between the parties would be without any understanding that representations of any kind were being made as a basis for the other's action, or inducements of any character held out for the purpose of bringing about a settlement; that the idea of having a voluntary settlement was one that had originated with the bondholders' committee and not with the Lynch interests, and that the Lynch interests were perfectly satisfied, as counsel expressed it, with meeting the bondholders in litigation and there settling their disputes before any bar at any time, if the controversy should remain unadjusted.

Judge Julian Mack, a principal witness on behalf of the complainants below, testified that although he knew nothing about the situation as it was claimed to exist at the time the present suit was filed, and knew nothing about it at the time he approved the agreement of February 15, 1928, and believed an entirely different situation to be true with respect to the status of the contracting parties, that nevertheless, an attorney, appearing before him representing the Lynch interests in the case, had stated positively in connection with the proposed settlement, that he had made, and was making, no representations whatsoever to the court, and that "the parties had dealt with each other at arm's length" and would continue on that basis. Judge Mack finally admitted that whatever impression he had gained concerning the subject of the alleged false representation charged to Lynch, was predicated "on the statements plus the silence" of said attorney and those acting with him.

Again the very agreement itself, as executed on February 15, 1928, and approved by Judge Mack, contained the following clause of which he testified he had express knowledge:

"Nothing herein contained shall be deemed to constitute an admission, agreement or representation as to the validity or priority of such liens or title retention claims, etc.," as were mentioned in the agreement.

Prior to this time Judge Mack had investigated and disapproved a proposed settlement on the basis of thirty cents on the dollar. After that episode, if he had not been expressly informed of the fact otherwise, he necessarily knew from the jockeying that was going on in an effort to secure a settlement, that each of the parties to it was demonstrating the utmost caution in proceeding, and that each was trying to get the better part of any bargain, if possible, involved in any settlement that might be agreed upon.

Mr. George E. Roosevelt testified that he was chairman of the bondholders' committee during the course of the negotiations leading up to the contract sought to be rescinded. When asked the inducements which really caused him to act in the premises as he did, he stated:

"Well, we felt we would very likely have the ground lease in default so that we might lose title to the property and we felt that we would very likely lose the furniture, even if we had the use of the property, and if we did, we couldn't operate the hotel and that it would undoubtedly be sold for taxes and other claims, so we had to get some kind of agreement to take care of the present claims. In my opinion it was a precarious situation and the whole series of facts in regard to the financial set-up, made me feel that it was essential *to make almost any kind of an agreement* so that credit would still be preserved and the committee, as a group, have something" (emphasis supplied).

Mr. Roosevelt also testified that it was the bondholders' committee which made the first venture toward seeking a settlement and that to accomplish this, the committee first sent its representatives to Lynch "to get some kind of a

trade." He also confirmed the fact, testified to by other witnesses, that the bondholders were told that "under no circumstances" must they rely upon anything that had or might be said relating to the Columbus Hotel controversy "as a basis for determining whether or not the trade negotiations finally should be signed." This fact was also testified to by Mr. Thatcher, bondholders' committee counsel, who admitted that before any papers were actually signed by Mr. Roosevelt, as chairman of the Bondholders' Committee, that he was informed by Lynch's counsel that under no circumstances were he or his clients, to rely upon any representations that had been made, or might be made, with respect to reaching a conclusion in the Columbus Hotel matter, but each party was to rely on his own independent judgment in the premises.

Thus it was made to appear in the evidence by complainants' own testimony, and verified by other evidence, that the contract of settlement of February 15, 1928, claimed to have been fraudulently induced by false representations concerning: the status of Miami Holding Company, the nature of the Holcomb assignment and the Cunningham retain title contract, was the result of negotiations initially opened by the Bondholders' Committee; that the agreement of February 15, 1928, was considered and signed in the face of an express notice to the representatives of the bondholders that if any settlement contract were signed by them at all, it should be done with the distinct understanding that all asserted claims between the parties, past, present, or future, were to be considered as so included; that thereafter "the door would be closed" upon any and all pre-existing matters in controversy, whether expressly referred to or not in the instrument of settlement.

To be remediable, a representation must have been of such a nature and made under such circumstances that the

injured party *had a right to rely upon it.* Bruner Bros. v. Strong, 61 Texas 555; Nixon v. Cooke (Texas Civ. App.), 279 S. W. 862; Edge v. Business Men's Assurance Company of America (Tex. Civ. App.) 15 S. W. (2nd) 44.

There can be no ground for complaint against representations where the hearer lacked the right to rely thereon, because he had reason to doubt the truth of the representation, as where the transaction was entered into upon the express understanding of both parties that a material fact might exist of which one of them was ignorant, or where a party has expressly said that he would not be bound by his representations, or was obviously hostile to the hearer and interested in misleading him. 12 Ruling Case Law, 352; 26 Corpus Juris 1141-1142; Smith v. Hollingsworth, 85 Fla. 431, 96 Sou. Rep. 394. Even where a representation is made, if at the time thereof, it is accompanied by a qualified statement which shows that the person making it does not intend that it shall be relied on, and which is reasonably calculated to suggest independent inquiry on the part of the person to whom it is made, the latter has no right to rely on it, and, on being deceived, claim that it was fraud. Am. & Eng. Ency. of Law, Vol. XIV, page 117.

Misrepresentations amounting to fraud that will invalidate a contract must be made by one contracting party to another in reference to a matter affecting the contract. The person to whom it is made must not only believe the false representation to be true, but must be so situated with respect to what is represented that he, at the time, has the right to rely upon the truth of the representation as made. This is so, because the false representation must be material to the contract and must have induced the contract to be made. When dehors the contract, a false representation cannot be said to have induced its making, when it was so made as to carry on its face no right on the party of anyone

to rely on its credence. Zavala Land & Water Company v. Tolbert (Texas) 165 S. W. 28.

We hold, therefore, as did the Chancellor, that even if the alleged misstatements and false representations credited to the Lynch interests had been made, as charged by the complainants, prior to the making of the contract sought to be rescinded, that the circumstances shown by the evidence to have existed at the time of the execution of that contract, were such that the Bondholders' Committee had no right to rely upon any such representations, in view of the fact that the parties were informed and must have understood at all times, that they were in hostile relations to each other and were dealing at arm's length. In addition to this is was expressly understood at the time the February 15, 1928, agreement was signed, that the Lynch interests were agreeing to it on their part for the specific purpose of "closing the door" on all pending and threatening litigation, and controversies relating thereto, concerning all of the matters then in issue between the contracting parties, whether known or not. A. L. R. Restatement of Law of Contracts, Par. 476-(d) page 910.

Contracts of settlement of pending controversies are favored by the courts.

And it is not to be lightly presumed that where parties have long been engaged in attempting to adjust a highly complicated controversy, such as appears in this case to have arisen between the Bondholders' Committee and their adversaries, that men experienced in matters of law and finance would deliberately enter into a sweeping and all-inclusive arrangement for settlement, without being fully apprised of all material matters affecting the settlement contract as executed.

The evidence does not support the charge of suppression of material facts which appellees, under the circumstances,

were bound to disclose to the Bondholders' Committee, or in regard to which S. A. Lynch and associates could not innocently remain silent. On the contrary, all of the facts and circumstances of the case show that the Bondholders' Committee at all times understood that they were bargaining with appellees concerning the adjustment of *charges which were themselves* imputations of unlawful concealment of facts and actionable fraud against S. A. Lynch and his associated corporations.

The principal purpose of the agreement of February 15, 1928, as we understand the evidence, and as that agreement on its face purports to show, was to finally wind up and conclude by means of some sort of arrangement between the disputants, an instrument of writing that would forever bar and foreclose any renewal of the insinuations and charges that the Bondholders' Committee had theretofore made or suggested concerning supposed liabilities of S. A. Lynch.

A duty to disclose pertinent facts is largely determined by the relationship of the parties.

And where parties are given to understand that they are dealing at arm's length *in the compromise of an already existing controversy that itself comprehends charges of legal fraud, misconduct and dishonest suppression of material facts,* as was the situation with the parties now before this Court in the instant proceeding, there arises no duty on the part of one of the antagonists to reveal his own peculiar situation to his adversary, on pain of being held liable for fraudulent concealment of facts if he does not do so. 1 Story's Equity Jurisprudence (14th Ed.) page 296; 12 R. C. L. 296, 307-309 Cleveland v. Smith, 132 U. S. 318, 10 Sup. Ct. 100, 33 L. Ed. 384; Reznor v. Maclary, 4 Houst. 241, 259; Taylor v. Bradshaw, 6. T. B. Monroe 145, 17 Am.

Dec. 132; Cobb v. Morrison, 79 N. H. 74, 104 Atl. 829; Ward v. Southfield, 102 N. Y. 287, 6 N. E. 660.

We do not construe this to be a case where the defendants are attempting to escape liability for admittedly false and fraudulent representations made by them prior to their contract, as an inducement for complainants to enter into same, as appellants have so strenuously argued. Nor have we found any substantial support for the argument that appellees rely for their defense upon the proposition that in a suit for rescission upon the ground of fraudulent misrepresentation of facts, they are to be permitted to escape liability for an admitted wrong, by merely showing in confession and avoidance thereof, that their agreement, wrongfully induced, was so designed as to close the door to all subsequent inquiry by the courts, by reason of an understanding to that effect at the time the agreement was signed.

On the contrary, as we read the record, defendants below (appellees here) relied chiefly upon the probative weight of the evidence to show that the Bondholders' Committee, notwithstanding its present contentions to the contrary, was never in reality induced to rely (and in fact did not rely) upon any representations of S. A. Lynch as a basis for its affirmative act in signing the agreement of February 15, 1928, but largely acted on its own individual judgment for what it thought was to the best interest of the bondholders at a critical time when it appeared to all concerned, that unless some speedy settlement involving in part matters in which Lynch was not interested, such as foreclosure for unpaid taxes, etc., the bondholders would lose all that their bonds represented.

The opportunity for complete investigation into the original agreement by which Lynch acquired an interest in Miami Holding Company, as well as the negotiations and agreements resulting in the construction of the Columbus Hotel,

including the sale of the sub-lease; the known transfer of the sub-lease from Holcomb; the inquiries that might have developed the sale of Lynch's stock in Miami Holding Company to that company for its assets; inquiries that could have been pursued concerning the loan from Lynch to Miami Holding Company and investigations suggested by a consideration of the foregoing, are all matters pertinent to the determination of a case of this kind.

Other facts appearing in evidence, such as the leasing of the Columbus Hotel to Operating Company of America, and the operation by it of the hotel; the collection and manner of application of the 1926 hurricane insurance money; the alleged back-dating of the Cunningham claim so as to make it appear as a potent threat to the interests of the bondholders; the inauguration of the investigations carried on by Mr. Thatcher, bondholders' counsel, prior to the tentative compromise of August, 1927; the facts developed at the hearing held in connection with Judge Mack's disapproval of the proposed contract of August 24, 1927, between the Bondholders' Committee and S. A. Lynch Enterprise Finance Corporation; the conferences, tentative contracts and developments thereafter; the subsequent negotiations between Hotel Management Company and the Bondholders' Committee leading up to the contract of February 15, 1928; the pointed refusal of attorney for the Lynch interests, while engaged in representing the Lynch interests, to comply with demands made upon him for a statement from his client to the effect that the guaranty of the bonds by Miami Holding Company was worthless because that company was insolvent—together with the inferences reasonably to be drawn from the foregoing circumstances and conditions, constituted ample warrant for a finding by the Chancellor that the probative weight, as well as the legal effect of the evidence as a whole, was and is to negative the idea that the

Bondholders' Committee was induced to act, as alleged, under a misapprehension of the true facts, or that its execution of the contract was premised upon any outside representations emanating from either S. A. Lynch, his business associates, or his counsel.

The reason for the bondholders' acceptance of the February 15, 1928, settlement, as we deduce it from the evidence, appears to have been that, while the Bondholders' Committee suspected fraudulent transactions on the part of S. A. Lynch that had operated to the detriment of the bondholders, they nevertheless realized at the same time that they would likely be unable to establish their suspicions in court, should they instigate litigation challenging the bizarre financial manipulations that had preceded the issuance and sale of the bonds. Vital litigation was already pending in the bondholders' behalf. And as Judge Mack himself put it, everyone concerned with trying to protect the bondholders realized that further delay in additional litigation would be highly prejudicial, because the situation with respect to the already pending litigation was daily becoming more and more precarious.

So it seemed no doubt to the Bondholders' Committee, as it appears to us, that an early settlement on the best possible terms for the benefit of the bondholders, was obviously an object not only to be desired at the time the February 15, 1928, trade was made, but was to be earnestly sought under the circumstances then existing.

That Lynch realized the bondholders' predicament and was willing to take advantage of it for his own particular benefit, is apparent. And it is reasonable to infer that while Lynch was willing to entertain negotiations for a settlement outside of court, that his principal reason for doing so was in order that he might conclude a contract by which

the likelihood of further litigation against his own interest would be definitely forestalled.

What was finally done, appears to have been accomplished by the parties, not as a result of anyone's particular representations or active inducements to have it brought about that way, but rather through a mutual desire on the part of all parties at interest to "get out" of their own situations, on the best possible terms as to financial benefits.

The effect of the Chancellor's decree was to decide the present controversy against the appellants because of their failure to prove their bill of complaint by sufficient evidence to establish ground for relief by way of the equitable remedy of rescission. The rule universally applied here on appeal from such a decree, is that a final decree on the facts of an equitable controversy will be upheld by this Court, unless the findings of the Chancellor appear to be clearly wrong in the light of the whole evidence. Hilton v. Northern Central Trust Company of Philadelphia, 114 Fla. 796, 154 Sou. Rep. 328.

Our conclusion is that no such showing of error has been made on the present appeal and that the decree appealed from should be affirmed.

Affirmed.

ELLIS and TERRELL, J. J., concur.

WHITFIELD, P. J., and BROWN and BUFORD, J. J., concur in the opinion and judgment.