ALLAPATTAH SERVICES,
INC., et al., Plaintiffs,

v.

EXXON CORPORATION, Defendant.

No. 91–0986–CIV–GOLD.

United States District Court,
S.D. Florida,
Miami Division.

Aug. 10, 1999.

Eugene Stearns, Miami, FL, Sidney Pertnoy, Gerald Bowen, McLean, VA, for plaintiff.

Larry Stewart, Miami, FL, Robert Abrams, Robert Brookheiser, Stuart Harris, Darren B. Bernhard, Robert Wallis, Houston, TX, for defendant.

### FINAL ORDER REGARDING EXXON'S AFFIRMATIVE DEFENSES AND PLAINTIFFS' ENTITLEMENT TO PREJUDGMENT INTEREST

GOLD, District Judge.

THIS CAUSE is before the Court *sua sponte*.[1] In response to Plaintiffs' cause of action for breach of contract, Exxon raised two affirmative defenses,[2] which, it contends, precludes a finding of liability as to, at least some of, Plaintiffs' claims: (1) the statutes of limitations in the various jurisdictions bar Plaintiffs' action as untimely[3]; and (2) releases affecting in excess of 5,000 dealer-members preclude the instant claim for breach of contract. Exxon additionally argues that Plaintiffs' attempt at avoiding these affirmative defenses by alleging fraudulent concealment cannot be adjudicated on a class-wide basis, but must be resolved in thousands of separate post verdict jury trials.[4] According to Exxon, a number of jurisdictions require Plaintiffs to prove the element of reliance in order to prevail on the fraudulent concealment claim, and, to the extent Plaintiffs are allowed to assert an avoidance, individualized issues of proof preclude resolution on a class-wide basis. Exxon also contends that some of the jurisdictions require Plaintiffs' fraudulent concealment claim to be proven by clear and convincing evidence, while others require only the standard civil burden of proof by a preponderance of the evidence. Exxon urges the Court to resolve its affirmative defenses on an individual basis, because class treatment in light of the jurisdictional variances would deprive Exxon of its right to meaningfully defend its position.

In contrast, although conceding that some jurisdictional differences exist, Plaintiffs contend that class-wide treatment of the common issues is appropriate. Plaintiffs aver that the common issues involved in their breach of contract claims out-number the differences; therefore, Plaintiffs should not be burdened at this stage of the proceedings with having to bring separate claims by the individual dealers. Plaintiffs have suggested

---

1. The Court has continued to exercise its pretrial duty to delineate and narrow the issues for trial and to eliminate improper issues. *See Johnson Enterprises, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1332–22 (11th Cir.1998). By prior orders, the late Judge Kehoe had denied Exxon's motions for summary judgment based on the grounds of: (1) statute of limitations [D.E. # 907]; and (2) release [D.E. # 911]. Since the issuance of the orders on summary judgment, the parties have focused on various other aspects of the case. However, in its pretrial orders, the Court has required the parties to further brief the defense issues. This Order endeavors to rule on the defense related issues and establish a procedure for post verdict procedures.

2. By order issued April 21, 1998, Judge Kehoe denied Exxon's motion for partial summary judgment on the grounds of superseding contract [D.E. # 910]. Exxon has not included this

ground in its statement of defenses for jury trial purposes. *See* Exxon's Response to Order on Status Conference [D.E. # 984] and its Supplemental Submission Regarding Affirmative Defenses [D.E. # 1149].

3. Plaintiffs did not file this case until May 13, 1991. Exxon contends that dealer claims in thirty of the thirty-five states are time-barred for purchases before May 13, 1987.

4. Exxon contends that: "With respect to those plaintiff's claims that are subject to an affirmative defense, separate proceedings for each plaintiff will be required to either allow the particular dealer to seek to 'avoid' the statutes of limitations or determine the intent of the parties to a release." Supplemental Submission of Defendant Exxon Corporation Regarding Affirmative Defense [D.E. # 1149], at 14.

alternatives to Exxon's decertification of the various issues, many utilized by courts which have previously addressed this situation.

The Court has reviewed the respective positions and arguments of the parties. Having considered the parties' concerns in light of the procedural history of this case and having conducted its own search of the law applicable in the relevant jurisdictions, the Court concludes that Plaintiffs' cause of action for breach of contract shall proceed on a class-wide basis in accordance with the following analysis and contingencies.

## DISCUSSION AND ANALYSIS

As a threshold matter, the Court recognizes the policies and principles which underlie the Uniform Commercial Code (the "UCC"). Drafted under the joint sponsorship of the American Law Institute ("ALI") and the National Conference of Commissioners on Uniform State Laws, the purpose of the UCC, including Article 2 thereof, is to "simplify, clarify and modernize the law governing commercial transactions" and "to *make uniform the law among the various jurisdictions.*" UCC § 1–102(2) (emphasis added). Except for Louisiana, all states have codified the pertinent sections of the UCC regarding the sale of goods. *See Pennzoil Co. v. Federal Energy Regulatory Comm'n,* 789 F.2d 1128, 1142 (5th Cir.1986). Although some variance exists, it appears that the differences are minor and do not contravene the purpose, as stated by the drafters of the UCC.

### Statute of Limitations in Contracts for Sale

Article 2 of the UCC also provides procedural uniformity for bringing actions predicated on contractual relationships. *See* UCC § 2–725.[5] The ALI's version, as well as those of most of the states, include an "official comment," announcing their purpose in adopting "a uniform statute of limitations for sales contracts":

> eliminating the jurisdictional variations and providing needed relief for concerns doing business on a nationwide scale whose contracts have heretofore been governed by several different periods of limitation depending upon the state in which the transaction occurred.

UCC § 2–725, cmt. Although most states have adhered to the four-year limitations period for actions on a contract for goods, a few states have opted for longer periods, while one state codified a shorter time in which to file contract claims.[6] Florida repealed its correlative UCC statute of limitations, requiring compliance with its general statute of limitations, under which actions on a contract are barred after the expiration of five years from the date the cause of action accrued. *See* Fla.Stat.Ann. § 95.11(2)(b).

Nearly all of the states have adopted language mirroring that of UCC § 2–725(4) drafted by the ALI. While discounting an aggrieved party's lack of knowledge of its cause of action as a basis for tolling or ex-

---

**5.** The ALI version of UCC § 2–725 [statute of limitations in contracts for sale] provides:
1. An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.
2. A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.
3. Where an action commenced within the time limited by subsection (1) is so terminated as to leave available a remedy by another action for the same breach such other action may

be commenced after the expiration of the time limited and within six months after the termination of the first action unless the termination resulted from voluntary discontinuance or from dismissal for failure or neglect to prosecute.
4. This section does not alter the law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this Article becomes effective.

**6.** Of the jurisdictions relevant to this action, Mississippi and South Carolina opted for a six-year statute of limitations on breach of contract and warranty claims. *See* Miss.Code Ann. § 75–2–725; S.C.Code Ann. § 36–2–725. In Colorado, claims on contracts for the sale of goods are barred after three years. *See* Colo.Rev.Stat.Ann. §§ 4–2–725, 13–80–101.

tending the statutory period, sometimes referred to as the "discovery rule," the subsection provides that it was not intended to "alter the law on tolling of the statute of limitations." UCC § 2–725(4).[7]

### The Ohio Exception

Ohio is an exception to this general rule.[8] Ohio's "savings clause" identifies the activity necessary to toll the statute, specifying that: "This section does not alter sections 2305.15 and 2305.16 of the Revised Code on tolling of the statute of limitations." Ohio Rev.Code Ann. § 1302.98(D). Having qualified its limitations period for actions arising from contracts on goods, the statute may be tolled only if: (1) the defendant "is out of the state, has absconded, or conceals *himself*"; or (2) the action against whom the cause of action is directed is disabled, due to either minority status or mental incompetence. *Id.* §§ 2305.15, 2305.16 (emphasis added). Since neither of these contingencies are present in the instant action, the four-year statute of limitations bars recovery of damages for the claims of Ohio Plaintiffs which accrued prior to May 13, 1987. This does not, however, preclude these Plaintiffs from recovering damages for Exxon's alleged breaches which occurred subsequent to that date.

7. Under the UCC, the discovery rule can toll the statute of limitations on actions for breach of warranties under certain circumstances. *See* UCC § 2–725(2).

8. Plaintiffs have argued to the contrary, citing *Standard Alliance Indus. Inc. v. Black Clawson Co.*, 587 F.2d 813, 820–23 (6th Cir.1978). However, in that case, the court was deciding an action brought for breach of an express warranty and noted that the discovery rule within Ohio Rev.Code § 1302.98(2) applied to toll the statute of limitations. The relevant section of the Ohio Revised Code, § 1302.98, became effective as of July 1, 1962. Therefore, at all relevant times—throughout the Discount for Cash period—the doctrine of fraudulent concealment could not toll the running of the statute of limitations for a breach of contract action predicated on the sale of goods.

9. Plaintiffs direct the Court's attention to the fact that *Sullivan*, an unpublished opinion of the Florida Supreme Court, is currently pending rehearing. *See Putnam Berkley Group, Inc. v. Dinin*, 734 So.2d 532, 533 n. 8 (Fla. 4th DCA 1999). Therefore, Plaintiffs argue, that avoidance based on fraudulent concealment is unclear in Florida.

### The Florida Exception

Analysis under Florida law is similarly unique, and adversely impacts on the recovery of damages for claims of Florida Plaintiffs that accrued prior to May 13, 1986. According to recent case law construing Florida's statute of limitations, Florida recognizes neither the discovery rule nor fraudulent concealment as vehicles for tolling the five-year limitations period for actions predicated on obligations imposed under a written instrument or contract. *See Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir.1999) (quoting *Federal Ins. Co. v. Southwest Fla. Retirement Ctr., Inc.*, 707 So.2d 1119, 1122 (Fla.1998)); *Fulton County Admin. v. Sullivan*, 22 Fla.L. Weekly S578, 1997 WL 589312 (Fla. Sept. 25, 1997) (absent an expression of the Legislature that fraudulent concealment may act to toll the statute of limitations, courts are constrained to honor the statutory bar except for those circumstances enumerated in § 95.051).[9]

### Contingencies for Tolling the Statutes of Limitations

As previously articulated, except for Florida and Ohio,[10] the uniform statute of limita-

However, *Sullivan* has since been cited with approval by the Florida Supreme Court. *See Federal Ins. Co. v. Southwest Fla. Retirement Center, Inc.*, 707 So.2d 1119, 1122 (Fla.1998). In turn, that case has been cited and relied upon by the Eleventh Circuit Court of Appeals. *See Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913 (11th Cir.1999). Accordingly, *Sullivan* is binding on this Court at this time.

10. Exxon maintains that New York is also an exception to the general rule that fraudulent concealment, if proven, tolls the statute of limitations for contract actions. However, research conducted by the Court reveals that New York does permit avoidance of a statute of limitations affirmative defense. *See, e.g., Cerulean Land Developers Corp. v. Colon Development Corp.*, 144 A.D.2d 615, 535 N.Y.S.2d 35, 37–38 (N.Y.App. Div.1988); *see also Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir.1995); *Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 232 (S.D.N.Y.1997); *Netzer v. Continuity Graphic Assoc., Inc.*, 963 F.Supp. 1308, 1316 (S.D.N.Y. 1997); *Union Carbide Corp. v. Montell N.V.*, 944 F.Supp. 1119, 1139 (S.D.N.Y.1996); *Johnson v. Nyack Hosp.*, 891 F.Supp. 155, 165 (S.D.N.Y. 1995).

tions does not preempt the states' laws on tolling the limitations period. *See* UCC § 2–725(4). To preclude the harsh effects of their statute of limitations, several states recognize acts perpetrated by a defendant for which the defendant is estopped from using the statute of limitations as a bar to a suit for liability. *See, e.g., First Baptist Church of Citronelle v. Citronelle–Mobile Gathering, Inc.*, 409 So.2d 727, 730 (Ala.1981) ("Tolling the statute of limitations in favor of the plaintiffs is not inconsistent with the function of the statute . . . [which is to] prevent revival of fraudulent or stale claims and prevent surprise after evidence is lost or obscured.") (citing U.S. Supreme Court precedent). Thus, the propriety of tolling the statute of limitations is based on equitable principles which underlie the laws of the respective states. *See Jafay v. Board of County Comm'rs of Boulder County*, 848 P.2d 892, 903 (Colo.1993) (when a rigid application of the statute of limitations leads to an unjust result, courts may properly fashion an equitable exception to the limitations period); *see also Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1096 (Colo.1996) ("equity may require a tolling of the statutory period where flexibility is required to accomplish the goals of justice"); *Brooks v. Southern Pacific Co.*, 105 Ariz. 442, 466 P.2d 736, 738 (1970) ("The policy underlying the statute of limitations is primarily for the protection of the defendant, and the courts, from litigation of stale claims *where plaintiffs have slept on their rights* and evidence may have been lost or witnesses' memories faded. This policy is sound and necessary for the orderly administration of justice.") (emphasis added). These equitable principles remove the statutory bar for conduct that includes, but is not limited to, fraudulent concealment of the wrongful conduct and the concept of continuing

breach. *See, e.g., Duell v. United Bank of Pueblo, N.A.*, 892 P.2d 336, 341 (Colo.Ct.App. 1994) (where a defendant's wrongful actions have been the cause of a plaintiff's failure to institute a timely action, the defendant may be estopped from relying upon the resulting delay as a defense to the plaintiff's claim).

To avoid the statutory bar, Plaintiffs have alleged that Exxon fraudulently concealed the Plaintiffs' cause of action. Based on its review, the Court concludes that thirty-three of the thirty-five jurisdictions involved recognize the doctrine of fraudulent concealment as an avoidance to the statute of limitations.[11] Of these jurisdictions, twenty-nine states require Plaintiffs to prove the elements of fraudulent concealment by a preponderance of the evidence, whereas six states require Plaintiffs to establish fraudulent concealment by clear and convincing evidence. The elements of fraudulent concealment vary to some degree among the jurisdictions. From Exxon's prospective, *each plaintiff* has the burden of proving each one of the elements.[12] For reasons discussed more fully below, the Court respectfully disagrees, and concludes that the factual disputes arising from the fraudulent concealment doctrine can be properly resolved on a class-wide basis by the jury in deciding the remaining class-wide issues, notwithstanding slight variations in state law as to how certain of the elements are described.

■ A claim or defense can implicate common issues and be litigated collectively, despite the existence of state law variations, so long as the elements of the claim or defense are substantially similar and any differences fall into a limited number of predictable patterns which can be readily handled by special interrogatories or special verdict forms. *See, e.g., In re Prudential Ins. Co. of America*

---

11. As will be discussed, the Court has found that, of the thirty-six jurisdictions involved, since there is no issue as to the statute of limitations with regard to Louisiana Plaintiffs, only thirty-five jurisdictions were relevant to the analysis. Additionally, of these thirty-five jurisdictions, Florida and Ohio are exceptions to the general rule. *See* discussions *supra*, at p. 672, and *infra*, nn. 15 & 16.

12. Exxon contends that each Plaintiff has the burden of proving that: (1) Exxon committed

affirmative acts intended to conceal its alleged failure to file suit until May 13, 1991; (2) the individual dealer reasonably relied on those acts in deciding not to file suit until May 13, 1991; (3) the individual dealer exercised due diligence in investigating or trying to uncover the possible existence of a claim; and (4) the individual dealer did not know or suspect the concealed facts underlying his cause of action. *See* Supplemental Submission of Defendant Exxon Corporation Regarding Affirmative Defenses, at 4.

*Sales Practices Litig.* 962 F.Supp. 450, 525 (D.N.J.1997) ("a manageable number of jury instructions could be fashioned to comport with the elements of the common law claims in the many jurisdictions.").

■■■ While Exxon contends that Plaintiffs' fraudulent concealment avoidance in this case presents individual issues because of variations of state law in the thirty-three relevant jurisdictions, a number of federal courts considering such matters have determined that the fraudulent concealment doctrine presents common issues capable of being litigated collectively in the class context. *See Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975) ("The overwhelming weight of authority holds that repeated misrepresentations of the sort alleged here satisfy the common 'question' requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit."). The commonality requirement is satisfied when the alleged misrepresentations constitute a "common course of conduct," even if the statements made to each Plaintiff were not identical.[13] *See Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 724–25 (11th Cir.1987); *Bresson v. Thomson McKinnon Sec. Inc.,* 118 F.R.D. 339, 343 (S.D.N.Y.1988); *In re Victor Tech. Sec. Litig.,* 102 F.R.D. 53, 56 (N.D.Cal.1984). "[A]lthough the communications to [the Plaintiff–Class] may not have been uniform, they allegedly were uniformly misleading. [Any] variations are therefore immaterial" and cannot defeat class treatment. *Bresson,* 118 F.R.D. at 343.

While oral misrepresentations have been held to be insufficiently similar to warrant class certification, written misrepresentations disseminated to all class members have often been found sufficiently similar. *Compare*

*Kaser v. Swann,* 141 F.R.D. 337, 339 (M.D.Fla.1991) *with Heastie v. Community Bank of Greater Peoria,* 125 F.R.D. 669, 679 (N.D.Ill.1989). Many cases predicated on securities violations have been certified as class actions with regard to pendent state law fraud claims. *See, e.g., In re Southeast Hotel Properties Ltd. Partnership Investor Litig.,* 151 F.R.D. 597 (W.D.N.C.1993); *In re Seagate Tech. Sec. Litig.,* 115 F.R.D. 264 (N.D.Cal.1987); *In re ORFA Sec. Litig.,* 654 F.Supp. 1449 (D.N.J.1987); *In re Energy Sys. Equip. Leasing Sec. Litig.,* 642 F.Supp. 718 (E.D.N.Y.1986).

■■■ Courts have also found that where there is a "common legal grievance," shared by the members of the class, "the benefit from the determination in a class action of the existence of a ... common pattern of fraud outweighs the problems of individual actions involving such other issues as causation, reliance, and damages." *In re Cadillac V8–6–4 Class Action,* 93 N.J. 412, 461 A.2d 736, 745–47 (1983). Where plaintiffs in a class action allege similar representations, the reliance issues may be presumed similar as well. *See Town of New Castle v. Yonkers Contracting Co., Inc.,* 131 F.R.D. 38, 43 (S.D.N.Y.1990) (common questions pervade fraudulent concealment inquiry); *Fisher Bros. v. Mueller Brass Co.,* 102 F.R.D. 570, 579 (E.D.Pa.1984) (same); *In re Screws Antitrust Litig.,* 91 F.R.D. 52, 55 (D.Mass.1981) (same); *In re Independent Gasoline Antitrust Litig.,* 79 F.R.D. 552, 559 (D.Md.1978) (same); *Reserve Life Ins. Co. v. Kirkland,* 917 S.W.2d 836, 843 (Tex.Ct.App.–Houst. 1996). Consequently, courts have permitted actions for fraudulent concealment to proceed as a nationwide class if:

> convinced that individual actions by claimants would impose a strangling harness on the judiciary, as well as the parties.... [and] [s]eparate actions would produce considerable duplication of effort, increase the cost of litigation, create the risk of inconsistent results for parties who are

---

**13.** To allege a "common course of conduct," Plaintiffs must allege in detail the specific misrepresentation and "identify or isolate any particular misstatement or omission contained in a document and contained in a subsequent docu-

ment which most of the other class members received." *See Blumenthal v. Great American Mortgage Investors,* 74 F.R.D. 508, 513 (N.D.Ga. 1976) (citation omitted).

similarly situated, and consume judicial resources to wasteful levels (through duplication) throughout the country.

*In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1045 (N.D.Miss.1993).

Here, the common questions arising from an assertion of the fraudulent concealment doctrine are: (1) Whether Exxon affirmatively concealed its breach from the dealer network; and (2) Whether the Dealer–Class, by exercising due diligence, could have determined that a breach occurred.[14] Both the evidence of Exxon's acts of concealment and the circumstances that would have triggered Plaintiffs' duty of due diligence would be common to the class. *See id.* at 1044.

Nevertheless, Exxon argues that the diversity among the jurisdictions regarding the elements necessary for establishing fraudulent concealment and the discrepancies in the burdens of proof require individual judicial attention. Thus, proof of the viability of Plaintiffs' avoidance is not conducive to class-wide management.

■ The Court is unpersuaded by Exxon's position that class-wide treatment of the relevant issues, which predominate, is inappropriate. In light of the overwhelming commonality and typicality of the issues and equitable concerns, the Court cannot "permit [Exxon] to contest the liability with each claimant in a single separate suit, [which] would, in many cases give [Exxon] an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what … the class suit practice was to prevent." *Weeks v. Bareco Oil Co.*, 125 F.2d 84, 90 (7th Cir.1941); *see also Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.").[15]

### *Fraudulent Concealment Avoids Statutory Time Bar*

Although some jurisdictional differences exist as to elements necessary to establish a claim of fraudulent concealment that avoids an affirmative pleading of a statute of limitations, the differences are not insurmountable so as to require decertification of the issue. In fact, jurisdictions which recognize fraudulent concealment fall into only two categories: those that require proof of reliance and those that do not.

■ Of the relevant jurisdictions surveyed, the Court found that eleven of the

14. According to Plaintiffs, Exxon accomplished this concealment by repeatedly assuring Plaintiffs that Exxon was adhering to its promise of offsetting its wholesale price for fuel to Plaintiffs by an amount that was equal, "on average," to the 3% credit card processing charge first assessed in August 1981. Because the cost of fuel is volatile and any proof that the offset was not implemented was contained in proprietary documents maintained exclusively by Exxon, Plaintiffs were forced to rely on Exxon's assurances of contractual performance. Plaintiffs, although suspicious that Exxon was performing as promised, did not realize a breach had occurred until 1991, when an Exxon official purportedly represented that Exxon had failed to continue, but would resume, applying the offset. Immediately upon this revelation, Plaintiffs filed their breach of contract suit.

15. Exxon also argues that a single jury cannot address the claims of Florida and Ohio Plaintiffs, where fraudulent concealment cannot avoid a statute of limitations affirmative defense, in tandem with claims of Plaintiffs permitted to assert fraudulent concealment. However, the Court disagrees with Exxon's assessment and is not persuaded by the authorities cited by Exxon in support. *Bruton v. United States*, 391 U.S. 123, 125, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968), was a criminal case wherein the Supreme Court was dealing with prejudicial testimony of a co-conspirator. In *Wilson v. Gillis Advertising Co.*, 145 F.R.D. 578, 582 (N.D.Ala.1993), the evidence precluded related to the net worth of the defendant, which the court found would improperly impact on the issue of the amount and propriety of awarding punitive damages. Here, there is no prejudice, because the Florida and Ohio Plaintiffs cannot avoid the statutory time-bar on grounds of fraudulent concealment. These Plaintiffs would "fall out" of the issue *if* the jury decides fraudulent concealment was practiced by Exxon. In other words, Florida and Ohio Plaintiffs cannot recover beyond the statutory period and will not benefit by a class-wide determination of fraudulent concealment. Conversely, Plaintiffs in the remaining jurisdictions will not be advantaged, because Plaintiffs from Florida and Ohio will be precluded from offering evidence substantiating fraudulent concealment.

thirty-three jurisdictions that permit tolling of the statute of limitations for fraudulent concealment contain a reliance element [16]: California, Colorado, Maine, Maryland, Montana, New Mexico, New York, South Carolina, Texas, Virginia, and Washington. *See Community Cause v. Boatwright*, 124 Cal. App.3d 888, 177 Cal.Rptr. 657, 664 (Cal.Ct. App.1981); *Kopeikin v. Merchants Mortgage & Trust Corp.*, 679 P.2d 599, 602 (Colo.1984); *Harkness v. Fitzgerald*, 701 A.2d 370, 372 (Me.1997); *Edwards v. Demedis*, 118 Md. App. 541, 703 A.2d 240, 251 (1997); *Poulsen v. Treasure State Indus., Inc.*, 192 Mont. 69, 626 P.2d 822, 827 (1981); *Continental Potash, Inc. v. Freeport–McMoran, Inc.*, 115 N.M. 690, 858 P.2d 66, 74 (1993); *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995); *Strong v. University of So. Carolina Sch. of Medicine*, 316 S.C. 189, 447 S.E.2d 850, 852 (1994); *Arabian Shield Dev. Co. v. Hunt*, 808 S.W.2d 577, 584 (Tex.Ct. App.–Dallas1991); *Metrocall of Delaware, Inc. v. Continental Cellular Corp.*, 246 Va. 365, 437 S.E.2d 189, 193–94 (1993); *Crisman v. Crisman*, 85 Wash.App. 15, 931 P.2d 163, 166 (1997). The remaining jurisdictions require only proof of an affirmative act of concealment, while some jurisdictions also require a showing that the plaintiff was reasonably diligent in detecting the wrongful activity which gives rise to the cause of action. *See, e.g., Colonia Ins. Co. v. City National Bank*, 13 F.Supp.2d 891, 900 (W.D.Ark.1998); *Resource Ventures, Inc. v. Resources Management Int'l, Inc.*, 42 F.Supp.2d 423, 436 (D.Del.1999); *Richards v. Mileski*, 662 F.2d 65, 70–71 (D.C.Cir.1981); *Jim Walter Corp. v. Ward*, 245 Ga. 355, 265 S.E.2d 7, 9 (1980); *Ludwig v. Ford Motor Co.*, 510 N.E.2d 691, 697 (Ind.Ct.App.1987); *Cunningham v. Massachusetts Mut. Life Ins. Co.*, 972 F.Supp. 1053, 1054 (N.D.Miss. 1997); *Foodtown v. Sigma Marketing Sys., Inc.*, 518 F.Supp. 485, 488 (D.N.J.1980); *Beauty Time, Inc. v. VU Skin Sys., Inc.*, 118 F.3d 140, 144 (3d Cir.1997); *Dean Witter Reynolds, Inc. v. McCoy*, 853 F.Supp. 1023, 1036 (E.D.Tenn.1994). Due diligence is a question of fact within the province of the jury's responsibilities. *See, e.g., Texas v. Allan Const. Co., Inc.*, 851 F.2d 1526, 1533 (5th Cir.1988); *Bradley v. Maryland Cas. Co.*, 563 F.Supp. 602, 607–08 (D.Del.1983).

■ As to those jurisdictions that require reliance, the essential issue is whether, under the circumstances of this class action, reliance on Exxon's purported deceit can be established on a class-wide basis. Considering the circumstances, the Court concludes that it can.

Several courts have found that the requirement that reliance must be justified in order to support recovery may be shown on a class basis. For instance, federal class action cases in which stockholders have alleged fraud on the basis of printed misrepresentations in a corporation's prospectus hold that individual proof may not be required to establish reliance by each stockholder. *See, e.g., Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir.1968).[17]

**16.** Although Florida requires reliance be proven to prevail on a fraudulent concealment claim, such a claim cannot toll the statute of limitations. *See Sullivan*, 1997 WL 589312, at *2–3. Likewise, reliance is required for fraudulent concealment in Ohio, but its statute of limitations for contracts for goods does not provide tolling for fraudulent concealment. *See* Ohio Rev.Code Ann. § 1302.98. Moreover, while reliance is a prerequisite for proving fraudulent concealment under Louisiana law, Louisiana's statute of limitations for contract actions is ten years, negating the need to either plead or prove fraudulent concealment as to those Plaintiffs, since this action was filed within the ten-year time-frame. *See* La.Civ.Code Ann. art. 3499.

**17.** Other cases in which class treatment of reliance has been held viable include the following: In consolidated actions against an automobile manufacturer that allegedly fraudulently induced purchasers to buy vehicles with a known design defect, the court properly certified the statewide class of approximately 7,500 purchasers where the purchasers' causes of action embraced common legal and factual elements and where benefit from determining the existence of a common defect and common pattern of fraud outweighed problems of individual actions involving other issues such as causation, reliance, and damages. *See In re Cadillac V8–6–4 Class Action*, 93 N.J. 412, 461 A.2d 736 (1983); in an action based upon an alleged breach of a retail installment sales contract for the purchase of a vacuum cleaner, the defendant was entitled to convert her counterclaim alleging fraud into a class action on behalf of all similarly situated purchasers of vacuum cleaners from the plaintiff, provided all prerequisites for class action status were met.

The essential class-wide reliance issue for the jury is whether the Plaintiff–Class, through representatives, relied upon false representations by Exxon in delaying the filing of an action within the limitations periods. Evidence of such reliance may be proven by direct or circumstantial evidence. *See, e.g., Blackie*, 524 F.2d at 902 (Ninth Circuit citing several jurisdictions in the Second, Ninth, and Tenth Circuits); *see also Poulsen v. Treasure State Indus., Inc.*, 192 Mont. 69, 626 P.2d 822, 827 (1981) ("An inference of reliance upon fraudulent representations may be drawn from circumstances surrounding the transaction which have been proven."); *Abramovitz v. Ahern*, 96 F.R.D. 208, 218 (D.Conn.1982).[18] Moreover, "where there is [proof of] active concealment, Plaintiffs' due diligence is irrelevant." *Township of Susquehanna v. H & M, Inc.*, 98 F.R.D. 658, 668 (M.D.Pa.1983) (citing *Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 472 F.Supp. 402, 406–07 (D.Colo.1979)).[19]

Exxon proffers no evidence or argument which purports to demonstrate that access to information and data substantiating a cause of action for breach of Exxon's promise to offset the credit card processing fee were available to some, but not all, of the dealers. To the contrary, the evidence proffered has been that Exxon continuously assured Plaintiffs that the offset was being applied "on average" to all of Exxon's dealers. Exxon admitted as much in deposition testimony of its executive officers: The question of whether the offset was being applied was raised by the dealer representatives every time Exxon addressed its dealers at national conferences, and every time the dealer representatives were told that the offset was in force. *See* Deposition of Voller, at 304–05. Whether these dealer representatives reported this information to those they represented and whether this information was disseminated raises questions of fact to be proved or disproved, and subsequently, decided by the jury.

As the case law instructs, Plaintiffs will bear the burden of proving fraudulent concealment, either by clear and convincing evidence or by a preponderance thereof. Depending on whether an individual jurisdiction

Establishment of a common course of conduct by salesmen pursuant to training or "canned" techniques taught by the plaintiff would be a "common strand of misrepresentation" running through all the sales, sufficient to warrant granting class action status. *See Compact Electra Corp. v. Paul*, 93 Misc.2d 807, 403 N.Y.S.2d 611 (N.Y.Sup.App.1977); where a small number of purchasers had attempted to bring a class action claiming that the defendant vendor had falsely represented to them and others that if they made purchases of frozen food at half price for two years, they would each be given a freezer without cost, *the court in held that, since the class was* described as including persons who were tricked, deceived, and misled into believing that they would get a freezer without charge if they would buy frozen food at one-half the price, it would be difficult to imagine one member of the class electing to pay out his contract to the last penny. Even if one such person were found, stated the court, he would not be a part of the class represented by those whose names appeared in the caption of the complaint. *See Robnet v. Miller*, 105 Ohio App. 536, 152 N.E.2d 763 (1957); a class action was properly brought by car purchasers against a manufacturer for fraud and misrepresentation in advertising and selling Oldsmobile automobiles with engines manufactured by Chevrolet. Each class member did not have to prove exposure to advertising as the advertising was conducted through the mass media; nor did each class member have to prove reliance on the advertising if the class representative presented sufficient evidence to raise a presumption affecting the burden of going forward with evidence that all class members relied on the advertising. *See Amato v. General Motors Corp.*, 11 Ohio App.3d 124, 463 N.E.2d 625 (1982).

**18.** Although Exxon "must be given fair opportunity to contest the validity of individual claims and to present defenses unique to particular claims.... At the same time, consistent with judicial economy and access to judicial relief objections to class actions, 'class members should be able to secure the relief to which they are entitled without expending more money and effort than is necessary.'" *Newberg on Class Actions* § 9.63, at 9–172 (3d ed.1992) (quoting source omitted).

**19.** The Court notes that some courts have reached contrary determinations. *See, e.g., Wolfson v. Artisans Savings Bank*, 83 F.R.D. 547, 551–52 (D.Del.1979) (limiting certified class to exclude members seeking to avoid a statute of limitations bar by asserting fraudulent concealment); *Bill Minnielli Cement Contracting, Inc. v. Richter Concrete Corp.*, 62 F.R.D. 381, 390 (S.D.Ohio1973) ("the questions of exercise of due diligence and success of concealment would have to be answered on an individual basis for each class member.").

requires that reliance be proven to support the claim, the reliance element may not be altogether eliminated. *See Waters v. International Precious Metals Corp.*, 172 F.R.D. 479, 485–86 (S.D.Fla.1996) (in cases where "a course of business or a device, scheme or artifice operates as a fraud, as long as the plaintiffs are able to prove the materiality of the omitted facts, proof of reliance is not prerequisite to recovery.").[20]

Correlatively, Exxon is entitled to rebut the reliance element. Although Exxon does not have "an unequivocal right to rebut the presumption of reliance on an individual basis," and its substantive trial rights will not suffer prejudice by placing limitations upon the amount of proof it may present, *id.* at 486, Exxon shall be given the opportunity to establish that any "misrepresentations in fact" did not induce a delay in filing a cause of action until after the statutes of limitations had run, or that dealers would not have filed a cause of action even if possessed with the knowledge that Exxon did not perform its promised contractual obligation. *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 248, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988). With this assumably disputed evidence, the parties may argue to the jury whether Plaintiffs met their respective burdens and whether the claim was successfully rebutted by Exxon.

### Statutes of Limitations Are Not a Complete Bar to Recovery

Even if the jury finds that fraudulent concealment was not proven, either by clear and convincing or a preponderance of evidence, Plaintiffs are not totally barred from recovering under their contract claims. Rather, the statute of limitations will only affect the extent to which respective Plaintiffs may recover. In other words, should the jury find that

fraudulent concealment did not apply, then, depending on jurisdictional constraints, some class Plaintiffs' claims will be time-barred after either 1988, 1987, 1986, or 1985. However, Exxon has not, and indeed cannot, argue that any Plaintiffs are completely barred by any relevant statute of limitation.

### Differing Burdens of Proof Do Not Preclude Class–Wide Adjudication

The parties disagree as to which burden of proof for claims of fraudulent concealment is applicable in the relevant jurisdictions. They agree that state law requires proof by clear and convincing evidence in at least four states: Connecticut, Maryland, Pennsylvania, and Virginia. However, Exxon contends that twelve other states adhere to this heightened burden of proving fraudulent conduct.

■ The Court has reviewed the cases cited by Exxon in the twelve disputed jurisdictions. In two of these jurisdictions, the Court agrees the exacting standard of clear, unequivocal, and convincing evidence is necessary to prevail on a claim of fraudulent concealment: Vermont and Washington. *See Hughes v. Holt*, 140 Vt. 38, 435 A.2d 687, 689 (1981); *Crisman v. Crisman*, 85 Wash.App. 15, 931 P.2d 163, 166 (1997). However, case law in the remaining jurisdictions illustrate no definitive inclination to subject Plaintiffs' avoidance of Exxon's statute of limitations affirmative defense based on claims of fraudulent *concealment* to a heightened standard of proof. In the absence of clear and convincing guidance from the respective state's courts, this Court will not imply a standard for proving fraudulent concealment other than by a preponderance of the evidence.[21]

---

**20.** As Plaintiffs assert, the Court may instruct a single jury as to the different burdens of proof applicable to fraudulent concealment. Such a practice will not be confusing or difficult. *See* Discussion at pp. 678–79, *infra; see also Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 609 (1st Cir.1985) ("The district court carefully and correctly explained the burden of proof applicable to the statutes and written interrogatories were submitted to the jury for findings on each of the three statutes. We think that the instructions, to which there were no objections, were sufficient to enable the jury to cope with the different burdens of proof and apply them correctly.");

*Bonilla v. Liquilux Gas Corp.*, 812 F.Supp. 286, 293 (D.P.R.1993) ("we find that the issue of different burdens of proof can be dealt with in the judge's instructions to the jury and need not lead to confusion.").

**21.** Generally, unless stated otherwise, the burden of proof in civil trials is by a preponderance of evidence. *See, e.g., Gates Rubber Co. v. Bando Chemical Indus., Ltd.*, 167 F.R.D. 90, 108 (D.Colo.1996) ("The burden of proof under which a trial is governed is 'preponderance of the evidence.' ").

Accordingly, Plaintiffs will be required to prove fraudulent concealment by clear and convincing evidence for their breach of contract claims governed by the law of the following jurisdictions: Connecticut, Maryland, Pennsylvania, Vermont, Virginia, and Washington.

As with Exxon's argument regarding decertification due to certain jurisdictional requirements for proving the element of reliance, the dichotomy created by the differing burdens does not create an insurmountable impediment to proceeding to trial as a class. To the contrary, although "application of the laws of multiple states to a common set of claims certainly has potential complexities, [ ] on analysis, procedures and litigation devices are available, in common usage, to render these tasks manifestly manageable for the court, the jury, and all the parties." *Newberg on Class Actions* § 9.68, at 9–184. These methods include carefully crafted jury instructions and special verdict forms. *See id.*

In the instant action, the discrepancy between the two standards of proof are amenable to the issue-structuring devices afforded by jury instructions and special verdict forms. For instance, a showing of fraudulent concealment by clear and convincing evidence necessarily satisfies the lesser burden of proof by a preponderance of the evidence. Should the jury find, through directives on the verdict form, that the evidence clearly and convincingly supports Plaintiffs' avoidance claim of fraudulent concealment, then the issue is resolved. On the other hand, should the jury determine that fraudulent concealment has not been clearly and convincingly proven, then Plaintiffs in the six enumerated jurisdictions will be barred from recovery on contractual damages which predated the applicable limitations periods. At that point, the jury will need to evaluate the evidence of fraudulent concealment pursuant to the preponderance of evidence standard. Should the jury find that the evidence satisfies this lesser standard, those Plaintiffs may recover from the time Exxon allegedly breached the Sales Agreements, regardless of the limitations applicable to those jurisdictions. However, if the jury finds neither burden has been met, then all Plaintiffs will be barred from recovering damages on breaches beyond their respectively applicable statute of limitations.

### Application of the Continuing Breach Doctrine

■ In addition to recognizing various theories to avoid the preclusive effect of a statutory time limitation, some jurisdictions have adopted a continuing breach doctrine. Under this doctrine, a cause of action for breach of a contract does not begin to accrue upon the initial breach; rather, on contracts providing serial performance by the parties, accrual of a breach of contract cause of action commences upon the occurrence of the last breach or upon termination of the contract. *See, e.g., Local 194, Retail, Wholesale & Dep't Store Union v. Standard Brands, Inc.,* 85 F.R.D. 599, 610 (N.D.Ill.1979) (complaint alleged continuing violation that reached back past the limits of the applicable statutes).

■ Having reviewed the contractual practices involved in this litigation in the context of case law adopting and applying the continuous breach doctrine, the Court finds that the concept cannot be used by Plaintiffs to toll the statutes of limitations. Those jurisdictions which have recognized the doctrine as an alternative equitable resolution to avoid the harsh impact of statutory limitations, applied it to successive or continuous breaches which occurred during the term of a singular contract. *See, e.g., Construction Interior Sys., Inc. v. Donohoe Cos., Inc.,* 813 F.Supp. 29 (D.D.C.1992); *Magna Assocs. v. Torgrove,* 585 F.Supp. 585 (D.Colo.1984); *Mullins v. Rockwell Int'l Corp.,* 15 Cal.4th 731, 63 Cal.Rptr.2d 636, 936 P.2d 1246, 1250 (1997); *Commercial Union Ins. Co. v. Porter Hayden Co.,* 116 Md.App. 605, 698 A.2d 1167, 1192 (1997); *AC, Inc. v. Baker,* 622 So.2d 331, 334 (Ala.1993) (for agreements constituting several, separate annual agreements, a breach of contract action accrues on each contract, individually, when performance under each contract is complete); *Intermedics, Inc. v. Grady,* 683 S.W.2d 842 (Tex.Ct.App.–Hous.1984); *Cannell v. Bulicek,* 8 Ohio App.3d 331, 457 N.E.2d 891, 896 (1983).

To decide the propriety of invoking the continuous breach doctrine for evaluating the time of accrual of a cause of action, the Court must first determine whether the contract is continuous or severable in nature. *See, e.g., Burger v. Level End Dairy Investors,* 125 B.R. 894, 901–02 (Bankr.D.Del. 1991). Where the nature of the contract is continuous, statutes of limitations do not typically begin to run until termination of the entire contract. *See id.* However, if the nature of the contract is severable, the statutes of limitations generally commence to run on each severable portion of the contract when a party breaches that portion of the contract. *See Worrel v. Farmers Bank of Del.,* 430 A.2d 469, 474–75 (Del.Super.1981).

Here, Plaintiffs renewed their Sales Agreements with Exxon, if at all, every three years. Each Sales Agreement was, therefore, severable in nature, since performance of the parties, as to that Agreement, was presumed complete upon expiration of an express term of years. Although it may be argued that Exxon had a continuous duty to act in good faith in terminating the contract and renewing the relationships with its dealers in subsequent, successive contracts, performance under the Sales Agreements, in and of itself, was severable, giving rise to a cause of action for breach of contract based on nonperformance. Moreover, as previously set forth in prior orders of this Court, a contractual breach of the covenant of good faith cannot be divorced from the actual breach of contract claim. *See Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 617 (3d Cir.1995) (good faith is an interpretive tool to determine the parties' justified expectations, and is not to be used for enforcement of "an independent duty divorced from the specific clauses of the contract"); *see also* UCC § 1–203, cmt. (no independent cause of action exists for failure to perform in good faith).

Plaintiffs have not persuaded the Court that each dealer's succession of Sales Agreements with Exxon constituted one, continuous contract that endured throughout the period of time the Discount for Cash program was in effect. Absent such evidence, or other unique circumstances which would distinguish the instant case from the factual scenarios of cases in which courts rejected the continuous breach doctrine for contracts severable in nature, the doctrine cannot be applied to toll the statute of limitations as codified by the relevant jurisdictions.

### Exxon's Affirmative Defense on Grounds of Release

### The Operative Language of the Releases

Exxon asserts as an affirmative defense that over 5,193 dealers who are members of the Plaintiff–Class executed standard Mutual Termination and Release Agreements ("Releases"). Except for a small number of Releases,[22] the standard form documents contain similar language. There are four standard versions of the Release provisions. The vast majority of the Releases include the following language, which defines the scope of the Release:

Releasing each other, as of the date of this Agreement, from all claims or causes of action which each now has against each other (whether or not known to either) including but not limited to, those arising directly or indirectly under, out of or in connection with each terminated instrument, or any sales or deliveries of petroleum products, tires, batters, and/or accessories by EXXON to DEALER, *EXCEPTING, HOWEVER,* claims of each party against the other for *trade accounts,* ... rental payments, *reimbursements,* indemnification and/or obligations arising under promissory notes, amortization agreements, mortgages,

---

**22.** Plaintiffs concede that 385 of the 5,193 Releases do not contain qualifying language that would except the basis of Plaintiffs' breach of contract claim; that is, these Releases do not contain reference to exceptions for "trade accounts" or "reimbursements." As to these Releases, Plaintiffs urge the Court to find that these class members may bring a separate action against Exxon to void the Releases in the event

Plaintiffs obtain a successful verdict against Exxon. The Court respectfully declines to address that issue. However, as noted *infra,* the Court concludes that, except in Delaware, even these Releases, **if entered into prior to Exxon's disclosure to the dealer-class of its breach,** are unenforceable if the jury finds breach of contract and fraudulent concealment **prior to the date the Releases were executed.**

and/or security agreements, and FURTHER EXCEPTING any claims of EXXON relating to real or personal property heretofore or now in DEALER'S possession.

(Emphasis added).

The second version of the Releases includes the exception for "trade accounts" but not "reimbursements" and the third version excepts "reimbursements" but not "trade accounts." A fourth version of the Releases (approximately 385 in number) contain neither exception.[23] The first appearance of this alteration in the record is reflected in a Release executed in 1993, after this litigation was filed.

Exxon contends that all four versions of the Releases cannot be construed under principles applicable to the UCC, and that the Releases unambiguously bar all claims and causes of action the parties thereto had, have, or will ever have, whether known or unknown at the time the Release was executed. Plaintiffs aver that the majority of the Releases contain language which expressly excepts the present cause of action from its otherwise broad preclusive effect.[24] Additionally, Plaintiffs submit that the Releases should be construed in conformance with UCC principles, as they are an indivisible and essential part of the course of performance and dealing between Exxon and its dealers. Finally, Plaintiffs question the validity of any Releases executed after certification of the class.

 The Court concludes as a matter of law that the Releases do not relieve Exxon of its individual obligation, and class-wide obligation, of good faith under its Sales Agreements with its dealers. To the contrary,

Exxon's duty of good faith under the original Sales Agreements was also applicable to its conduct in obtaining Releases from the dealer-class. If the jury determines, through special interrogatories, that Exxon breached its good faith obligation to its dealers under the Sales Agreements, and that such breach was fraudulently concealed from the class, then the Releases may not, in good faith, be uniformly enforced against an involuntary waiver of those rights. Here, Exxon does not contend that any dealer "voluntarily" and "knowingly" waived any rights with respect to the class claims at issue because, without dispute from Exxon, it met its obligations; however, if Exxon did knowingly "take back" the cost of credit adjustment, and, therefore, breached its good faith contractual obligation to its dealers, it would have contracted for the Releases in bad faith, by non-disclosure, thereby nullifying the Releases as to the instant claim. The Court further concludes that: (1) the Releases fall within the governing scope of the UCC; (2) general, all-encompassing releases must be narrowly construed, which dilutes their efficacy; and (3) Releases obtained post-certification may be invalid.

## Validity of Releases Under the UCC

Contrary to Exxon's position, the Court finds that the UCC does provide the basic governing law for determining the validity of a release. Under Article 2 of the UCC, the term "waiver" means an intentional relinquishment of a known right. *See In re Humboldt Fir, Inc.*, 426 F.Supp. 292, 297 (N.D.Cal.1977). The waiver of one or more contract provisions leaves the remaining terms in force. *See id.; see also V–M Corp.*

**23.** The Court has not undertaken a count of the Releases which fall into this category. However, the parties agree on this point: that no qualifying language is contained in 385 of the Releases in issue.

**24.** Plaintiffs contend that the plain meaning of the terms "trade accounts" and "reimbursement," which appear in the vast majority of the Releases, unambiguously, and, as a matter of law, except Plaintiffs' claims from the Releases. Although the analysis set forth below does not primarily rely on these arguments, the Court concludes that Plaintiffs' arguments are well-

founded as an alternative ground for finding the Releases unenforceable as applied to the specific facts of this case. The term "trade accounts" is defined by Exxon in the Releases as "including without limitation monies due and owing either party associated with motor fuel purchases or any other products purchased from Exxon by Dealer," a description that is readily applicable to this case. Similarly, Plaintiffs' claim is contemplated by the plain and ordinary definition of "reimbursement": "to pay back, to make restoration, to repay that expended; to indemnify, or make whole." *Black's Law Dictionary* (6th ed.).

*v. Bernard Dist. Co.*, 447 F.2d 864, 866 (7th Cir.1971).

■ Releases are a form of contract, and therefore, must be interpreted pursuant to contract law. *See, e.g., Weingart v. Allen & O'Hara*, 654 F.2d 1096, 1103 (5th Cir.1981); *Gibbs v. Dodson*, 229 Ga.App. 64, 492 S.E.2d 923, 926 (1997); *Prall v. Indiana Nat'l Bank*, 627 N.E.2d 1374, 1377 (Ind.Ct.App.1994) ("A release is a species of contract.... The interpretation of a release, like any other contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances."); *Ristau v. Wescold, Inc.*, 318 Or. 383, 868 P.2d 1331, 1333 (1994) ("A release agreement is a contract subject to the rules of contract construction and interpretation."). Although state contract law must be applied, "the laws concerning the construction of a general release are more or less uniform among the states." *Coral Gables Imported Motorcars, Inc. v. Fiat Motors of No. America, Inc.*, 673 F.2d 1234, 1238 (11th Cir.1982).

Since all of the Releases refer to the termination of the Sales Agreements and Automotive Credit Card Guide, the Releases and Agreements referenced therein are considered and construed in the aggregate. *See, e.g., New Life Corp. of America v. Thomas Nelson, Inc.*, 932 S.W.2d 921, 925 (Tenn.Ct. App.1996) ("A contract must be construed with reference to the situation of the parties, the business to which the contract relates, and the subject matter as it appears from the words used."); *Anheuser–Busch Cos., Inc. v. Summit Coffee Co.*, 858 S.W.2d 928, 933 (Tex. Ct.App.–Dallas 1993) ("When a release refers to a related document, the other document should be taken into consideration."). The Court, having determined that the Sales Agreements at issue come under the auspices of the UCC, finds that the Releases are amenable to UCC construction.

■ The UCC includes a section, entitled "Waiver or Renunciation of Claim or Right After Breach," which expressly covers the release of claims arising from UCC-governed contracts. *See* UCC § 1–107. The section provides:

Any claim or right arising out of an alleged breach can be discharged in whole or in part without consideration by a written waiver or renunciation signed and delivered by the aggrieved party.

UCC § 1–107. The purpose of this section is to permit parties to renounce or waive "rights or claims arising out of an alleged breach of a commercial contract." UCC § 1–107, cmt. However, in construing the enforceability of a contractual release under the UCC, the provisions of the release "must be read in conjunction with the section imposing an obligation of good faith." *Id.* This duty of good faith must be present throughout the entire formation, as well as the performance, of the contract. *See* UCC § 2–209; *cf. IPEC Inc. v. International Lithographing Corp.*, 869 F.2d 1080, 1084 (7th Cir.1989) ("Any modification or waiver as to the first contract, though it did not necessarily need to be supported by consideration, had to meet the test for good faith imposed by the Uniform Commercial Code.").

■ The duty of good faith incorporated into each contract, either express or implied, assures that neither party acts in a manner that destroys the rights or interests of the other party to the agreement. *See Savoca Masonry Co., Inc. v. Homes & Son Const. Co., Inc.*, 112 Ariz. 392, 542 P.2d 817, 821 (1975). As previous orders of this Court have held, whether Exxon breached its duty of good faith is a question of fact for the jury. *See Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 728 (Minn.1985). However, like contracts, if the terms of the Release are unambiguous, construction of the contract is a matter of law for the Court to decide. *See Ristau*, 868 P.2d at 1333; *Hurt v. Leatherby Ins. Co.*, 380 So.2d 432, 433 (Fla.1980) (when the language in a release is clear and unambiguous, courts cannot indulge in construction nor interpretation of its plain meaning).

### Waiver of a Right Must Be Knowing and Voluntary

■ The interpretation of the effect of a release is based upon the intention of the parties to the instrument. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 346–48, 91 S.Ct. 795, 810–11, 28 L.Ed.2d

77 (1971). In narrowly construing a general release, it is crucial that it be interpreted so that it discharges only those rights intended by the parties to be relinquished. *See Vaughn v. Didizian*, 436 Pa.Super. 436, 648 A.2d 38, 40 (1994). Although courts favor "the finality of settlements," *see, e.g., Pettinelli v. Danzig*, 722 F.2d 706, 710 (11th Cir. 1984), "[c]laims or demands ... are not discharged unless expressly embraced [in the release] or falling within the fair import of the terms employed." *Bilotti v. Accurate Forming Corp.*, 39 N.J. 184, 188 A.2d 24, 35 (1963). A general release does not discharge liability for unknown damage already done. *See Gibbs v. Dodson*, 229 Ga.App. 64, 492 S.E.2d 923, 926 (1997). Thus, "[a]n intention to release a party from liability for unknown conduct must be clearly expressed in the release." *Id.* at 926–27 (citation omitted).

### Jurisdictional Survey

■■■■ The majority of the jurisdictions relevant to the instant controversy adhere to the general rule that a waiver must be made knowingly and voluntarily, and that "not every settlement that refers to post-settlement conduct necessarily results in a prospective waiver." *Adams v. Philip Morris*, 67 F.3d 580, 584 (6th Cir.1995) (construing a release under Kentucky law).[25] The laws of Delaware, have interpreted the concept of a general release as encompassing all claims between the parties, whether in the contemplation of the parties or in existence at the time the release was made.

**25.** The Court finds that, except for Delaware, courts in the relevant jurisdictions concur. *See, e.g., People's Bank v. Pioneer Food Indus., Inc.*, 253 Ark. 277, 486 S.W.2d 24, 28 (1972) ("waiver" is a voluntary relinquishment of a known right); *Casey v. Proctor*, 59 Cal.2d 97, 28 Cal. Rptr. 307, 378 P.2d 579, 584 (1963) (general releases do not extend to claims which the releaser does not know or suspect to exist in his favor at the time of executing the release); *Scotten v. Landers*, 190 Colo. 27, 543 P.2d 64, 66 (1975) ("equity will strike down without hesitation" any release which is not fairly and knowingly made); *Muldoon*, 650 A.2d at 1245 (the Connecticut Supreme Court has held that "[t]he general words in a release are limited always to that thing or those things which were specially in the contemplation of the parties at the time when the release was given. But a dispute that had not emerged, or a question which had not arisen at all, cannot be considered as bound and concluded by the anticipatory words of a general release."); *Columbus Hotel Corp. v. Hotel Management Co.*, 116 Fla. 464, 156 So. 893, 901–02 (1934) (release entered into between parties who had "been long engaged in attempting to adjust a highly complicated controversy" supported conclusion that parties were "fully apprised of all material matters affecting the settlement contract as executed"); *Conner v. Fisher*, 136 Ind.App. 511, 202 N.E.2d 572, 575 (1964) ("waiver" is the voluntary yielding up of some existing right); *Bernstein v. Kapneck*, 46 Md.App. 231, 417 A.2d 456, 464–65 (1980) (a release does not bar existing but unknown damages "not within the contemplation of the parties at the time of contracting for such release"); *Kerr v. Small*, 112 Mont. 490, 117 P.2d 271, 273 (1941) (equates "waive" with "acquiesc[e]" in tax deed validity contest); *Gerbig v. Gerbig*, 60 Nev. 292, 108 P.2d 317, 318 (1940) (equates "waive[r]" with "voluntar[y]" acceptance); *Keelan v. Bell Comm. Research*, 289 N.J.Super. 531, 674 A.2d 603, 609 (1996) (a release executed by one "who is unaware of his rights is not a knowing or voluntary release"); *Beneficial Finance Co. of Jersey City, Inc. v. Norton*, 76 N.J.Super. 577, 185 A.2d 218, 220 (A.D. 1962) ("waiver" is a voluntary, clear and decisive act, implying an election to forego some advantage which the waiving party might have insisted on); *Ed Black's Chevrolet Center, Inc. v. Melichar*, 81 N.M. 602, 471 P.2d 172, 174 (1970) ("[i]n no case will a waiver be presumed or implied, contrary to the intention of the party whose rights would be injuriously affected thereby");*Vaughn*, 648 A.2d at 40 ("The courts of Pennsylvania have ... interpreted the release as covering only such matters as can fairly be said to have been within the contemplation of the parties when the release was given."); *New Life Corp. of America v. Thomas Nelson, Inc.*, 932 S.W.2d 921, 925 (Tenn.Ct.App.1996) ("a demand of which a party was ignorant when the release was given is not as a rule ... embraced therein"); *Panorama Residential Protective Ass'n v. Panorama Corp. of Wash.*, 97 Wash.2d 23, 640 P.2d 1057, 1060 (1982) ("a waiver is an intentional and voluntary relinquishment of a known right"). The Court acknowledges that its jurisdictional analysis has rendered a result different from those of the parties. The Court concedes that the majority of the cases used in its jurisdictional survey did not involve underlying UCC contracts, but the analysis appears analogous to the Release circumstances at issue in the instant matter. Moreover, the Court found no authority to preclude the applicability of common law principles where they are not displaced by provisions of the UCC. *See Gorge Lumber Co. v. Brazier Lumber Co.*, 6 Wash.App. 327, 493 P.2d 782, 787 (1972) (construing release of claims arising from underlying UCC contract). Given these decisions, it can be logically concluded that releases interpreted under the UCC would receive the same analysis and result in similar conclusions.

See *Hob Tea Room, Inc. v. Miller,* 89 A.2d 851, 856 (Del.1952) ("a general release, one which is intended to cover everything—what the parties presently have in mind, as well as what they do not have in mind, but what may, nevertheless, arise" is a "general and final settlement" of all claims of the parties).[26] Moreover, in Virginia, while there must be an intent to include a claim of unknown damages, the releaser must show mutual lack of intent by "clear, cogent and convincing evidence." *Marshall v. Cundiff,* 211 Va. 673, 180 S.E.2d 229, 232 (1971).

Although general releases may be enforceable, it is commonly held that "based on a realistic recognition that releases contain standardized, even ritualistic, language and are given in circumstances where the parties are looking no further than the precise matter in dispute," ascertaining the underlying intent of the parties and their knowledge at the time of executing the release is crucial. *Mangini v. McClurg,* 24 N.Y.2d 556, 301 N.Y.S.2d 508, 513, 249 N.E.2d 386 (N.Y.App. Div.1969). Relevant to the inquiry "is whether there has been a conscious and deliberate intention by the parties to release" the claims which existed but were unknown to them at the time they entered into the release. *LaFleur v. C.C. Pierce Co., Inc.,* 398 Mass. 254, 496 N.E.2d 827, 832 (1986).

■■■■ Of course, a compromise and settlement of a *bona fide* controversy between the parties constitutes a valid and binding agreement. *See Ruble Forest Prods., Inc. v. Lancer Mobile Homes of Oregon, Inc.,* 269 Or. 315, 524 P.2d 1204, 1206 (1974). Thus, a release which clearly and unequivocally mentions the claim to be released acts as a complete bar concerning all matters covered by the release. *See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 938 (Tex.1991) (claims not clearly within the subject matter of the release are not discharged, even if they existed when the release was executed; the release must "mention" the claim to be released).

### Application of Jurisdictional Law to the Releases

Viewing the Releases in the context of the applicable laws, there is no clear language that the parties intended the Releases to bar claims for Exxon's alleged breach of its promise to offset the credit card processing fee against its wholesale fuel price. As noted above, Exxon's own position, at least throughout these proceedings, belies any intent on its part to have included the instant breach of contract claim in the Release.

■■■■ Exxon has repeatedly represented that it was not legally obligated to reduce its wholesale fuel price, however, it nonetheless did lower the price in an amount which "on average" offset the cost of credit card receipts submitted by its dealers. Exxon has steadfastly denied the validity of Plaintiffs' breach of contract claim. Since it was not clear to the parties that Plaintiffs even had a claim, there is no evidence to permit a reasonable inference that the parties agreed to extinguish the instant action. Moreover, the Sales Agreement explicitly states: "Termination of this contract by either party for any reason shall not relieve the parties of any obligation theretofore accrued under this contract." Sales Agreement, at ¶ 18(g). This language, together with Exxon's own exceptions for "trade accounts" and "reimbursements," would tend to infer that rights already perfected under the respective Sales Agreement could not be waived. Given these circumstances and Exxon's position, the Court concludes, as a matter of law, assuming the jury finds breach of contract and fraudulent concealment, that the affected dealers did not [and could not] knowingly and voluntarily intend to waive damages resulting from a breach of the covenant of good faith in fixing the open price term when the Releases were executed.

### Validity of Releases Executed Post–Certification

The parties dispute the validity of the Releases entered into between Exxon and mem-

**26.** As to Delaware, the Court concludes that the Releases involved are not enforceable against the affected dealers that included the "exception" language referenced in footnote 24, *supra.* The Delaware Releases would be enforceable, if at all, against those dealers whose Releases contain no such qualifying language (i.e., the Category-four releases).

bers of the Plaintiff–Class after the filing of the instant action and the issuance of the order certifying this case as a class action. Plaintiffs contend that the Releases are unenforceable as a bar to this action, because Exxon did not disclose the existence of the pending litigation or dispute, and therefore, these dealers did not knowingly and voluntarily release the claims involved in this suit. Plaintiffs additionally argue that these Releases should be set aside because ethical rules governing attorneys precludes a party from settling with individual class members in the absence of participation by counsel for the class. In response, Exxon urges that the Releases are valid and act to totally bar this action.[27]

The Court finds that the post-certification Releases are governed by the same principles of law and policy that govern the pre-certification Releases. That is, for the Releases to be valid, they must have been knowingly and voluntarily made and procured in good faith. *See, e.g., Scotten v. Landers*, 190 Colo. 27, 543 P.2d 64, 67 (1975).

 Having reviewed an exemplar of the Release executed post-certification, as supplied by the parties, the Court finds no express mention of the instant litigation. Because this action was pending at the time these Releases were negotiated and executed, even if the affected Plaintiffs had constructive notice of the claims filed by the dealer-class, the Releases do not definitively demonstrate that the claim was intended by the parties thereto to be included in the general waiver of claims. *See Victoria Bank & Trust Co.*, 811 S.W.2d at 938 (if the claims existed when the release was executed, the release must mention the claims to be discharged). Consequently, the Court concludes, as a matter of law, that the Releases executed after certification of the Plaintiff–Class cannot bar those Plaintiffs from participating in the litigation of this action.[28]

## ISSUES REGARDING PREJUDGMENT INTEREST

Plaintiffs have requested that any judgment entered in their favor include all interest which accrued prior to the rendered verdict. Exxon opposes Plaintiffs' contention that the issue of prejudgment interest can be handled on a class-wide basis. Rather, according to Exxon, the various jurisdictions differ as to the decisionmaker of entitlement to prejudgment interest, the time from which prejudgment interest accrues, and the nature of the evidence relevant to deciding whether and to what extent Plaintiffs are entitled to prejudgment interest. Having reviewed the submissions of the parties and conducted an independent search of the laws in the relevant jurisdictions, the Court concludes as follows:

 Prejudgment interest, pursuant to statute, is awarded as a matter of right in twenty-five jurisdictions, and accrues from the date on which the money was wrongfully withheld, in this case, from the date of the breach.[29] Those jurisdictions are: Alabama,

27. In support, Exxon cites to a prior order entered by Judge Kehoe in July 1992, which denied Plaintiffs' motion to enjoin Exxon from entering into the Releases. However, having reviewed Judge Kehoe's order entered July 1, 1992, the Court disagrees with Exxon's interpretation. Judge Kehoe found "no evidence ... to suggest that [Exxon was] seeking out these potential class members for the purposes" of undermining the participation of dealers in the class action by "obtaining releases." Order [D.E. # 218], at 2–3. Because Judge Kehoe found that not allowing Exxon to inform the terminating dealers of the pending litigation, which was necessary for an informed waiver, placed Exxon in an untenable position, he specifically refused to enjoin Exxon's business practices of procuring a Release "when a dealer *chooses to end his relationship.*" *Id.* at 3 (emphasis added).

28. Having found that the post-certification Releases do not preclude those Plaintiffs from proceeding to a verdict, it is unnecessary for the Court to address whether the Releases obtained post-certification are *voidable based on ethical* rules regulating the practice of law.

29. These jurisdictions require that the damages be liquidated in nature. "A claim is liquidated when it is subject to mathematical computation without reliance on opinion or discretion." *Aries v. Palmer Johnson, Inc.*, 153 Ariz. 250, 735 P.2d 1373, 1384 (Ct.App.1987). Based on the evidence in the record and the testimony of the parties' respective experts, the Court has determined that Plaintiffs breach of contract damages are liquidated. As trial progresses, should it become apparent that the damages are not calculable as to be "subject to mathematical computa-

California, Colorado, Delaware, District of Columbia,[30] Florida, Georgia, Kentucky, Louisiana,[31] Maryland,[32] Massachusetts, Montana, Nevada, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Vermont, Washington,[33] West Virginia, and Wyoming.[34] While three additional jurisdictions award prejudgment interest as a matter of right, interest is calculated as accruing from the date Plaintiffs made formal judicial demand, which would be the date the Complaint was filed on May 13, 1991. These jurisdictions are: Arizona, Maine, and New Hampshire.

■ In the remaining jurisdictions, entitlement to prejudgment interest is discretionary, requiring the presentation of evidence in support of such entitlement. Only one jurisdiction, Virginia, requires that the issue be decided by the fact finder. *See* Va.Code Ann. § 8.01–382 ("In any action at law or suit in equity, the verdict of the jury, or if no jury the judgment or decree of the court, *may* provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence.") (emphasis added); *see also Dairyland Ins. Co. v. Douthat,* 248 Va. 627, 449 S.E.2d 799, 801 (1994) ("This section provides for the discretionary award of prejudgment interest by the trier of fact, who 'may provide for' such interest and fix the time of its commencement. The accrual of post-judgment interest, however, is mandatory ...."). The Virginia Supreme Court has

tion," the Court shall amend its conclusion accordingly.

**30.** Two sections of the District of Columbia's Code regulate the allowance of interest on judgments. Under D.C.Code § 15–108, prejudgment interest is mandatory "to recover a liquidated debt on which interest is payable by contract or by law or usage." Pursuant to D.C.Code § 15–109, prejudgment interest is merely discretionary when the amount is unliquidated or is not provided by contract, law, or usage. *See Giant Food, Inc., v. Jack I. Bender & Sons,* 399 A.2d 1293, 1305 (D.C.1979). Under the circumstances, the Court finds that § 15–108 applies, permitting the award of prejudgment interest as a matter of right. Although the contracts at issue are silent as to the award of any interest, case law instructs that "[w]here there has been a complete deprivation, prejudgment interest is an element of complete compensation for the loss of use of [ ] money 'from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress.' " *Nolen v. District of Columbia,* 726 A.2d 182, 185 (D.C.1999) (quoting *Riggs Nat'l Bank v. District of Columbia,* 581 A.2d 1229, 1253 (D.C.1990) and *West Virginia v. United States,* 479 U.S. 305, 310–11 n. 2, 107 S.Ct. 702, 706 n. 2, 93 L.Ed.2d 639 (1987)).

**31.** Louisiana has different accrual periods, depending on whether the claim is for a breach of a promise under the contract (*"ex contractu "*), for which interest begins accruing from the time of the breach, or whether damages are requested for a breach of a duty under a contract (*"ex delicto "*), for which interest accrues from the date of the judicial demand, or the filing of the complaint. Since the Court has repeatedly found that a breach of the duty of good faith cannot be a separate cause of action, the Court concludes that any prejudgment interest should accrue from the date of the breach.

**32.** For entitlement to prejudgment interest as of right in Maryland, there must be an obligation to tender a certain sum upon a certain date. *See Crystal v. West & Callahan, Inc.,* 328 Md. 318, 614 A.2d 560, 572 (1992) ("The ordinary rule in contract cases, if the contract requires payment of a sum certain on a date certain, is [that] prejudgment interest typically is allowed as a matter of right.").

**33.** In Washington, although entitlement to prejudgment interest on liquidated claims is a matter of right, a trial court, in its discretion, may reduce or disallow such interest upon a finding that the plaintiff unreasonably delayed in prosecuting a claim. *See Colonial Imports v. Carlton Northwest, Inc.,* 83 Wash.App. 229, 921 P.2d 575, 583 (1996) ("prejudgment interest on liquidated claims ordinarily is a matter of right, but ... trial judges have discretion to disallow such interest during periods of unreasonable delay in completing litigation that is attributable to claimants.").

**34.** Wyoming normally requires that a formal demand notifying the defendant that an amount is due be made before the accrual period for interest commences. *See, e.g., Northern Gas Co. v. Town of Sinclair,* 592 P.2d 1138, 1143 (Wyo. 1979). However, the Wyoming Supreme Court has also recognized that when deprived of the beneficial use of money, a plaintiff should be compensated for the loss during the time of the deprivation. *See Goodwin v. Upper Crust of Wyoming, Inc.,* 624 P.2d 1192, 1198 (Wyo.1981) (the plaintiffs "were entitled to the use of the money they were to receive under the agreement from the date it became due.... [Therefore,] [p]rejudgment interest should have been awarded in an attempt to compensate for that loss.").

declared that "prejudgment interest is an element of compensatory damages." *Pulliam v. Coastal Emergency Servs. of Richmond, Inc.*, 257 Va. 1, 509 S.E.2d 307, 321 (1999) (citation omitted).

While Virginia's statute clearly assigns the discretionary authority to award prejudgment interest to the jury, the proof necessary for deciding whether it is appropriate and from what date prejudgment interest should accrue is less defined. However, appellate decisions instruct that the touchstone is a sum that will fully and fairly compensate Plaintiffs for the damages sustained for the delay in the payment of money due. *See, e.g., Gill v. Rollins Protective Servs. Co.*, 836 F.2d 194, 198 (4th Cir.1987) (prejudgment interest is compensatory in nature "and is designed to compensate the plaintiff who has been without deserved relief for an extended period of time."); *City of Danville v. C & O Ry.*, 34 F.Supp. 620, 638 (W.D.Va.1940) (prejudgment interest is allowed when it "appears necessary to compensate the plaintiff adequately, i.e. to make him whole"); *COOMBS v. SUMMITT*, 1996 WL 1065539, at *5 & n. 6 (Va.Cir.Ct. May 20, 1996) (providing Virginia Model Jury Instruction regarding damages and prejudgment interest in a negligence cause of action).[35]

■ In six jurisdictions, the Court decides whether prejudgment interest should be awarded. Those jurisdictions are: Connecticut, Indiana, Mississippi, New Jersey, New Mexico, and Tennessee. *See* Conn.Gen. Stat.Ann. § 37–3a; *Brandewiede v. Emery Worldwide*, 890 F.Supp. 79, 82 (D.Conn.1994) ("An award of prejudgment interest pursuant to Section 37–3a is an equitable determination within the discretion of the court."); Ind.Code Ann. § 34–51–4–7; Miss.Code Ann. § 75–17–7; N.J.Stat.Ann. § 12A:2–710; *Meshinsky v. Nichols Yacht Sales, Inc.*, 110

N.J. 464, 541 A.2d 1063, 1070 (1988) (prejudgment interest may be awarded on contract claims in the discretion of the court in accordance with equitable principles); N.M.Stat.Ann. § 56–8–4; Tenn.Code Ann. § 47–14–123. However, in Mississippi, accrual is not discretionary, and commences at the time the complaint was filed. *See* Miss. Code Ann. § 75–17–7 (the judgment "shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint."). Similarly, while Indiana allows for some judicial discretion, "the court shall determine the period during which prejudgment interest accrues.... However, the period may not exceed forty-eight (48) months." Ind.Code Ann. § 34–53–4–8. In Connecticut, New Jersey, New Mexico, and Tennessee, the Court is given full discretionary authority to determine the appropriate time from which prejudgment interest may be awarded. Nevertheless, the Court must recognize that "the equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it was entitled, but which has been retained by another." *Sulcov v. 2100 Linwood Owners, Inc.*, 303 N.J.Super. 13, 696 A.2d 31, 39 (App.Div. 1997); *see also Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn.1992). Factors which the Court may consider in reaching a determination include: whether the detention of the money was wrongful under the circumstances; whether the sum recovered was a liquidated amount; and whether Plaintiffs diligently presented their claim. *See Brandewiede*, 890 F.Supp. at 82.

The remaining issue necessary for resolution is the rate at which interest should accrue. For instance, the New Mexico statutory rate of prejudgment interest becomes

---

**35.** This Court does not have ready access to the Virginia Model Jury Instructions. Therefore, Plaintiffs' counsel shall be responsible for providing the relative instruction and to brief the Court as to the evidence they intend to proffer to assist the jury in determining: (1) the propriety of prejudgment interest for the Virginia Plaintiffs necessary to fully compensate for the loss of the use of any wrongfully withheld money by Exxon; and (2) the date from which prejudgment interest should accrue in order to effectuate complete relief. Recognizing that the proffer of this evidence as to only the Virginia Plaintiffs might infer that either: (1) only Virginia Plaintiffs would be entitled to prejudgment interest; or (2) all other Plaintiffs will receive prejudgment interest in the event of a favorable verdict, the Court shall bifurcate that part of the proceedings to ensure the interests of the Virginia Plaintiffs, as well as Exxon, are equally considered and protected.

fixed at the rate in effect at the time the action is filed. *See Grynberg v. Roberts,* 102 N.M. 560, 698 P.2d 430, 433 (1985). While in other jurisdictions, it will be necessary to determine the various rates to which prejudgment interest was subjected throughout the entitlement period—either from the date of breach or the date the complaint was filed. The parties will be required to supply such data to the Court. Otherwise, the entitlement and accrual periods of prejudgment interest shall be in accordance with the aforementioned conclusions.